2014-1498

# United States Court of Appeals
# for the Federal Circuit

U.S.I.A. UNDERWATER EQUIPMENT SALES CORPORATION,

*Appellant,*

v.

DEPARTMENT OF HOMELAND SECURITY,

*Appellee.*

*Appeal from the Civilian Board of Contract Appeals in Case No.*
*CBCA 2579, Jeri Kaylene Somers, Administrative Judge*

## BRIEF FOR APPELLANT U.S.I.A.
## UNDERWATER EQUIPMENT SALES CORPORATION

JOSEPH BILLINGS
MILES & STOCKBRIDGE
100 Light Street
Baltimore, MD  21202
Tel: (410) 385-3497
Fax: (410) 773-9087
jbillings@milesstockbridge.com

*Counsel for Appellant*
*U.S.I.A. Underwater Equipment*

FILED: AUGUST 22, 2014
CORRECTED: AUGUST 29, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Petitioner, U.S.I.A. Underwater Equipment Sales Corporation, certifies the following:

1. The full name of every party or amicus represented by me is:

U.S.I.A. Underwater Equipment Sales Corporation

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  None

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:  None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Joseph G. Billings, Miles & Stockbridge P.C.


August 22, 2014          <u>/s/ Joseph G. Billings</u>
                              Joseph G. Billings
                              Miles & Stockbridge P.C.
                              100 Light Street
                              Baltimore, MD 21202
                              jbillings@milesstockbridge.com
                              Direct Tel (410) 385-3497
                              Direct Fax (410) 773-9087
                              jbillings@milesstockbridge.com

i

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................... vii

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ......................................................1

   I.   JURISDICTION BELOW ......................................................1

   II.  JURISDICTION ON APPEAL .............................................1

   III. FINAL DECISION ...............................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE.................................................................2

   I.   NATURE OF THE CASE .....................................................2

   II.  PROCEEDINGS BELOW .....................................................2

   III. BOARD DECISION ............................................................3

STATEMENT OF THE FACTS ............................................................3

SUMMARY OF ARGUMENT .............................................................25

   I.   THE ORDER CONSTITUTED AN OPTION CONTRACT
      THAT U.S.I.A. DECLINED TO COMPLETE PRIOR TO THE
      PURPORTED TERMINATION ...............................................29

   II.  USCG BREACHED THE ORDER BY PURCHASING SUITS FROM
      ANOTHER CONTRACTOR .....................................................30

III. USCG MATERIALLY BREACHED THE ORDER BY FAILING
TO MEET ITS DUTY OF GOOD FAITH AND FAIR DEALING
BY ACTING EVASIVELY AND FAILING TO COOPERATE
WITH U.S.I.A. ...............................................................................30

IV. USCG FAILED TO ESTABLISH THAT U.S.I.A.'S DRY SUITS
LEAKED BECAUSE THE NAVY IMPROPERLY TESTED
THE DRY SUITS ...........................................................................31

ARGUMENT ....................................................................................32

I.   STANDARD OF REVIEW ...........................................................32

II.  BURDEN OF PROOF ..................................................................33

III. THE ORDER CONSTITUTED AN OPTION CONTRACT THAT
U.S.I.A. DECLINED TO COMPLETE PRIOR TO THE
PURPORTED TERMINATION ....................................................34

IV. USCG BREACHED THE ORDER BY PURCHASING SUITS
FROM ANOTHER CONTRACTOR.............................................36

V.  USCG MATERIALLY BREACHED THE ORDER BY FAILING TO
MEET ITS DUTY OF GOOD FAITH AND FAIR DEALING BY
ACTING EVASIVELY AND FAILING TO COOPERATE
WITH U.S.I.A. ...............................................................................40

   A.   USCG Failed To Respond To Inquiries From U.S.I.A. And
        Provide Details Relating To Testing Methodology And Test Results ......43

   B.   USCG Unreasonably Failed To Accept U.S.I.A's Offer To Test
        Five Reworked Suits With U.S.I.A. Observing And Insisting On
        The Navy Testinging Suits Without U.S.I.A. In Attendance ...................46

   C.   USCG Purchased Replacement Dry Suits Before Termination
        Of The Order ..............................................................................48

VI. USCG FAILED TO ESTABLISH THAT U.S.I.A.'S DRY SUITS
LEACHED BECAUSE THE NAVY IMPROPERLY TESTED
THE DRY SUITS ........................................................................ 49

   A.  The Navy Failed To Properly Test The Suits As Part Of A System ......... 52

      1.  The Navy Did Not Conduct Its Tests At A Proper Temperature ......... 52

      2.  The Navy Failed To Use The Proper Undergarments ......................... 53

   B.  The Navy Used A More Stringent Test Standard For Defining A Leak ... 55

   C.  The Seals Ripped Because Of Navy Errors ............................................... 56

   D.  The Zippers Were Not Always Seated ...................................................... 57

   E.  The Navy Improperly Counted Leakage From The Seals As A Failure ... 58

CONCLUSION AND STATEMENT OF RELIEF SOUGHT .............................. 59

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Astro Science Corp. v. United States,*
471 F.2d 624 (Ct. Cl. 1973)..................................................................33

*Broad Ave. Laundry & Tailoring v. United States,*
681 F.2d 746 (Ct. Cl. 1982)..................................................................37

*C. Sanchez & Son, Inc. v. United States,*
6 F.3d 1539 (Fed. Cir. 1993) ...............................................................45

*Crewzers Fire Crew Transp., Inc. v. United States,*
111 Fed. Cl. 148 (Fed. Cl. 2013), affirmed ,
741 F.3d 1380 (Fed. Cir. 2014) (Unpublished).....................................34

*Lakeshore Eng'g Servs. v. United States,*
748 F.3d 1341 (Fed. Cir. 2014) ....................................................... 40, 41

*Lisbon Contractors, Inc. v. United States,*
828 F.2d 759 (Fed. Cir. 1987) ..............................................................33

*Malone v. United States,*
849 F.2d 1441 (Fed. Cir. 1988), ........................................... 31, 40, 42, 45, 46, 48

*Metcalf Constr. Co., Inc. v. United States,*
742 F.3d 984 (Fed. Cir. 2014) ..............................................................41

*Nuclear Research*,
814 F.2d 647, 650 (Fed. Cir. 1987) ................................................. 33, 34

*Stone Forest Industries, Inc. v. United States,*
973 F.2d 1548 (Fed. Cir. 1992) ....................................................... 30, 38, 39

*Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC,*
683 F.3d 1330 (Fed. Cir. 2012) ...........................................................40

**Board Cases**

*Comptech Corporation,*
  ASBCA No. 55526, 2008-2 B.C.A. (CCH)
  P33,982, 2008 ASBCA LEXIS 76 (October 1, 2008) ........................... 29, 34, 35

*Praoil, S.r.L.,*
  ASBCA Nos. 41499, 94-2 B.C.A. (CCH) P26,840, 133,
  1994 ASBCA LEXIS 89 (March 31, 1994) ........................................34

*T&G Aviation, Inc.,*
  ASBCA No. 40428, 2000-2 B.C.A. (CCH) P31,147,
  2000 ASBCA LEXIS 161 (October 10, 2000).....................................45

*TTF, L.L.C.,*
  ASBCA Nos. 58495, 58516, 2013-1 B.C.A. (CCH)
  P35, 403, 2013 ASBCA LEXIS 81 (September 3, 2013) ...................................34

*U.S.I.A. Underwater Equipment Sales Corporation, Appellant, v. Department Of
  Homeland Security, Respondent,*
  CBCA No. 2579, 2014-1 B.C.A. (CCH)
  P35,503, 2014 CIVBCA LEXIS 19 (January 27, 2014) .......................................3

**Statutes**

41 U.S.C. § 7104 ......................................................................................1

41 U.S.C. § 7105(e)(1)(B) ......................................................................1

41 U.S.C. § 7107(a)(1)(A) ......................................................................1

41 U.S.C. § 7107(b) ..............................................................................32

**Rules**

48 CFR 13.004(b) ............................................................. 29, 35

48 CFR 13.302-4...................................................................35

48 CFR Chapter 1 ...................................................................2

48 CFR 52.212-4(m)..............................................................59

## **STATEMENT OF RELATED CASES**

1.  No appeal from the U.S. Civilian Board of Contract Appeals in Docket No. 2579 has previously been before this or any other appellate court.

2.  Counsel for Appellant, U.S.I.A. Underwater Equipment Sales Corporation, knows of no case pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.


August 22, 2014                                    /s/Joseph G. Billings
        Date                                       Signature of counsel

                                                   Joseph G. Billings
                                                   Printed name of counsel

# JURISDICTIONAL STATEMENT

## I.    JURISDICTION BELOW

Pursuant to the Contracts Disputes Act, 41 U.S.C. §§ 7104 and 7105(e)(1)(B), the U.S. Civilian Board of Contract Appeals ("CBCA") had jurisdiction to hear the appeal of U.S.I.A. Underwater Equipment Sales Corporation ("U.S.I.A."). On September 16, 2011, the United States Coast Guard ("USCG") terminated for cause U.S.I.A.'s contract. On October 5, 2011, which was within 90 days of the termination, U.S.I.A. filed a notice of appeal with the CBCA.

## II.    JURISDICTION ON APPEAL

This Court has jurisdiction over this appeal pursuant to 41 U.S.C. § 7107(a)(1)(A). U.S.I.A. filed its petition for review on May 20, 2014, which is within 120 days of the CBCA's decision of January 27, 2014.

## III.    FINAL DECISION

The CBCA denied the entire appeal by its decision of January 27, 2014. Accordingly, this appeal is from a final decision that disposed of all claims with respect to all parties.

1

## STATEMENT OF THE ISSUES

1. Whether U.S.I.A.'s substantial performance of a purchase order for dry suits unilaterally issued by USCG under U.S.I.A.'s Federal Supply Schedule contract created an option contract that U.S.I.A. cancelled prior to USCG's purported termination for cause.

2. Whether USCG materially breached the purchase order by purchasing replacement dry suits from another contractor prior to the purported termination of the purchase order.

3. Whether USCG materially breached the purchase order by breaching its duty of good faith and fair dealing by acting evasively and failing to cooperate with U.S.I.A.

4. Whether USCG established that U.S.I.A.'s dry suits leaked through the Navy's testing.

## STATEMENT OF THE CASE

### I.    NATURE OF THE CASE

This case involves the propriety of USCG's termination for cause of U.S.I.A.'s purchase order for 777 dry suits under the commercial items provisions of Part 12 of the Federal Acquisition Regulation ("FAR") located at 48 CFR Chapter 1. U.S.I.A. asserts the termination was wrongful and seeks either breach damages or the conversion of the termination for cause to one for convenience.

### II.    PROCEEDINGS BELOW

The parties stipulated to slightly over 27 pages of facts (A176-203) so the trial was limited to one day on May 14, 2013. The parties filed post-trial briefs on July 12, 2013 and reply briefs on July 26, 2013.

2

### III.    BOARD DECISION

By decision of January 27, 2014, published at *U.S.I.A. Underwater Equipment Sales Corporation, Appellant, v. Department Of Homeland Security, Respondent*, CBCA No. 2579, 2014-1 B.C.A. (CCH) P35,503, 2014 CIVBCA LEXIS 19 (January 27, 2014), the CBCA upheld the termination for cause.

### STATEMENT OF THE FACTS

On August 25, 2010, USCG issued Request for Quote HSCG23-10-Q-QW2859 ("Solicitation") for Boat Crew Dry Suits under FAR Subpart 8.4, which governs ordering under the Federal Supply Schedule ("FSS") administered by the General Services Administration ("GSA").  (A2, 189)  The Solicitation identified three acceptable model numbers, including U.S.I.A.'s Model CG/8880.  (A2)

USCG and U.S.I.A. agreed that U.S.I.A. would submit a quote offering the same dry suit, Model CG/8880, it was providing under an indefinite delivery indefinite quantity contract ("IDIQ or Headquarters Contract") (A2, 189-90) by which U.S.I.A. delivered to USCG 4,754 dry suits from September 29, 2006 to September 29, 2011.  (A2, 186, 189)  The quote included the same terms, including a reduced price from U.S.I.A.'s FSS contract GS-07F-0209K ("FSS Contract"), as found in the IDIQ or Headquarters Contract.  (A2, 190)

The FSS Contract included FAR 52.212-4, Contract Terms And Conditions – Commercial Items (FEB 2007), which included several pertinent provisions.

3

(A182-86)  Paragraph (a) of FAR 52.212-4 included an inspection and acceptance provision that read, in pertinent part, as follows:

> The Contractor shall only tender for acceptance those items that conform to the requirements of this contract.  The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance.  The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price.

(A182)  Paragraph (f) of FAR 52.212-4 included an excusable delays provision that read, in pertinent part, as follows:

> The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.

(A183)  Paragraph (l) of FAR 52.212-4 included a termination for convenience provision that read, in pertinent part, as follows:

> Subject to the terms of this contract, the Contractor shall be paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination.

(A184)  Paragraph (m) of FAR 52.212-4 included a termination for cause provision that read in its entirety as follows:

> The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.

4

In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

(A185)

On September 25, 2010, USCG issued unilateral purchase order HSCG23-10-F-QW2859 (the "Order") under U.S.I.A.'s FSS Contract, at the price of $465,423, for the delivery of 777 dry suits within 75 days.  (A2, 107-126)  Only USCG signed the Order.  (A107, 191)

Section E, Inspection and Acceptance, of the Order included provisions that were not included in the Solicitation.  (A2, 191)  The Order included an additional paragraph in section E, entitled "E2, Inspection and Acceptance Requirements." (A2, 118, 191) Paragraph E.2 of the Order provided for acceptance testing in accordance with Maintenance Procedure 583020.0 REV D, dated August 8 (sic, 18), 2008 (Maintenance Procedure).  (A191)  The Maintenance Procedure is for the Maritime Cold Weather Suit System ("MCWSS").  (A191, 201)  The MCWSS is discussed in the Rescue and Survival Systems Manual (A103-06), which is the same suit as the suit in litigation.  (A84)

The dry suit is part of a system (the MCWSS) where the system is tested rather than the suit alone.  (A86)  The dry suit is part of a three layer system

(A103), with the first layer being a polypropylene undergarment and the second layer being a fleece insulating undergarment. (A102)

Paragraph E.2 required, among other things, that, prior to acceptance and in accordance with the USCG Maintenance Procedure 583020.0 REV D dated August 18, 2008 ("Maintenance Procedure"), the dry suits be subjected to an immersion test to check for leaks. *Id*.

The Maintenance Procedure required USCG to perform a leak test as follows:

> a.  Have the member don undergarments, socks, the dry suit and boots.  A hood and gloves shall be worn if required for the local climate
> b.  Have the member enter a body of water deep enough to allow him/her to stand or swim immersed to the top of the neck seal.  After a minimum of 15 minutes, have the member exit the water.
> c.  Ask the member whether the dry suit leaked.  Minor seepage aground the wrist and neck seals is normal and does not indicate a leak.  Isolated water soaked spots on the undergarment, or soaked socks, indicates a leak. Flooding into the dry suit socks indicates a serious leak.

(A129-30)

The USCG's CWO Shea testified (A52-53) that the "undergarments" referenced in the Maintenance Procedure were the polypropylene and fleece undergarments required by the Rescue and Survival Systems Manual, COMDTINST M10470.10F ("Don layer 1 polypropylene followed by layer 2 fleece insulating undergarments."). (A105)

On November 10, 2010, U.S.I.A. shipped 100 dry suits to the USCG Training Center in Yorktown, VA.  (A191)  The 100 dry suits were the same as those provided by U.S.I.A. under the IDIQ or Headquarters Contract.  *Id*.

However, the Order included some different requirements for the wrist and neck seals than prescribed in the IDIQ or Headquarters Contract so USCG rejected the 100 dry suits.  (A3, A192)  On December 20, 2010, the parties resolved the matter through a bilateral modification to the Order to upgrade to neoprene/chloroprene neck and wrist seals with a price increase of $32,105.00 (from $465,423.00 to $497,528.00) and a change to the delivery date to 150 days after award, making the new delivery date February 22, 2011.  *Id*.

On December 29, 2010, U.S.I.A. shipped 120 dry suits with the newly configured seals, which the Yorktown Training Center received on January 7, 2011.  (A3, 192)  USCG tested three dry suits and found that all three leaked at the relief (crotch) zipper.  (A3, 192-93)

On January 12, 2011, the contracting officer, Robert Mann-Thompson, told U.S.I.A. not to send any more dry suits until the parties discussed the matter. (A3, 193)  On the same day, Jerry Langan, U.S.I.A.'s Vice President of Underwater Equipment Sales, responded that "[t]his is the first time I have ever heard of an issue with the relief zipper in five years of making the dry suits.  Please have them

expedite the leaky suits back to USIA using our Fed Ex account #1433-5348-6."
(A193)

On January 13, 2011, Jerry Langan further responded to the contracting officer, suggesting that, before USCG returned the suits, USCG, as provided in "the user manuals that come with the suit (sic, suits)", ensure that the personnel performing the testing (1) wax the entry zipper and relief zipper and make sure they are properly closed; and (2) talc the neck and wrist seals. (A132, 193) The reference to "the user manuals" refers to the User Manuals supplied by U.S.I.A. with its suits. (A193)

The User Manual includes donning instructions that require, *inter alia*, the removal of "all rings, watches, earrings, necklaces and eyewear, as these can damage the suit while donning"; the lubrication of "the neck seal and wrist seals with unscented talcum powder on both the inside and the outside of the seal"; use of the "index finger and middle finger" to "stretch the neck seal"; and waxing the zippers and ensuring the zippers are closed. (A193-94)

The User Manual includes doffing instructions that require, *inter alia*, the use of fingers to stretch the neck and wrist seals while removing the dry suit. (A194)

The User Manual requires compliance with COMDTINST M10470.10E, the predecessor to COMDTINST M10470.10F, with respect to the wearing of

undergarments.    (A195)    COMDTINST M10470.10E prescribes use of polypropylene and fleece.   (A195)   Both versions of the Rescue and Survival Systems Manual prohibit the use of cotton undergarments.  (A195-96)

On January 18 and 24, 2011, USCG conducted further testing of the dry suits, with USCG asserting that many of the dry suits leaked.  (A3, 196-97)  USCG did not notify U.S.I.A. of the testing on either January 18 or January 24, 2011 so U.S.I.A. did not witness the testing.  *Id.*

On January 19, 2011, U.S.I.A. sent 100 dry suits to USCG, along with an invoice for $59,900.  (A3, 196)  USCG received the 100 dry suits on January 27, 2011.  (A199)

In an email of January 27, 2011, the contracting officer advised U.S.I.A. that many of the dry suits from the delivery of 120 dry suits failed testing that was conducted in accordance with USCG procedures (Maintenance Procedure) and the operations manual (User Manual) that came with each of the dry suits; USCG received the shipment of 100 dry suits; USCG would not accept any more shipments until the issue was resolved; and USCG would hold a conference call early the next week.  (A3, 197-98)

On January 27, 2011, U.S.I.A. again questioned whether the tests had been properly conducted.   (A3)   Specifically, on January 27, 2011, Jerry Langan responded to the contracting officer's email of January 27, 2011, asking, "Can you

be more specific about what failed?  These suits have been in service for nearly 5 years." (A198)

Later on January 27, 2011, Jerry Langan sent another email in response to the contracting officer's email that 39 of 120 suits leaked asking, "What failed?" (A198)  The contracting officer responded the same day that "[w]e will discuss next week and the numbers are updated from the COTR to 105 of 120.  Please await the meeting request from Lerna." (A198)  Jerry Langan responded the same day asking, "Can we set something up ASAP.  I'm flabbergasted at these numbers." (A198)  The contracting officer responded the same day that "I would love to, but we have some extremely urgent things that need to get out in the next few days.  However, next week early like Monday [or] Tuesday should be okay." (A198)

Jerry Langan responded the same day on January 27, 2011 with the following statements:

> Two weeks ago we had a couple suits leaking in the crotch zipper.  Now we have 90% of the suits leaking and no one will let us know where or how.  We have nearly 400 suits about ready to ship.  All I need is a couple minutes with someone today.  This is a critical issue for our company.

(A3, 198)  The contracting officer responded the same day on January 27, 2011 that "[t]his is urgent to us to (sic), but do not ship them.  If I can we can try to talk tomorrow, but there is no time today." (A199)

10

On January 31, 2011, Jerry Langan asked the contracting officer: "Have we been able to set up a meeting?" (A199) The contracting officer did not contact U.S.I.A. until February 1, 2011, when the contracting officer issued a cure notice. (A4)

Meanwhile, on January 28, 2011 and April 20, 2011, USCG issued two delivery orders to Kokatat, Inc. ("Kokatat") for a total of 482 suits, with 423 of those suits purchased as *replacement* suits at a cost of $380,172.10 to cover suits under the Order. (A4-5, 199, 203, 207-08) USCG did not apprise U.S.I.A. of the two *replacement* purchases from Kokatat until USCG submitted its Appeal File in this litigation. (A4-5, 199, 203)

In the cure notice of February 1, 2011, the contracting officer advised U.S.I.A. that USCG considered U.S.I.A.'s failure to supply acceptable dry suits to be a condition endangering performance of the Order. (A4, 138) The cure notice indicated that USCG tested them in accordance with "suit maintenance procedures" and "the zippers were properly waxed and talcum powder was applied to the wrist and neck seals" according to the manufacturing instructions. (A138) The cure notice indicated that the suits leaked from the zippers and seams and that they were not acceptable. (A138, 199). The contractor was instructed not to ship additional suits until the matter was cured. *Id.* The contractor was also advised that if the matter were not cured within 15 days after receipt of the cure notice, the

11

Government may terminate the contract for cause.  *Id.*  Finally, the contractor was instructed to arrange to retrieve his property from the USCG site.  *Id.*  The test results attached to the cure notice indicated that a number of neck seals and one wrist seal had torn.  (A139-44)

On February 1, 2011, Jerry Langan told the contracting officer that U.S.I.A. was "still waiting for a response on the conference call.  We are extremely concerned with the problems and really would like to know what the issues are."  (A4, 144.1)  On February 2, 2011, the contracting officer responded that "[t]he results of the tests were attached to the cure notice.  We can discuss this matter, but you're still obligated to cure this [within] the time frame of the notice."  *Id.*  Later the same day U.S.I.A. told the contracting officer that U.S.I.A. had received the cure notice and had "issued a call tag to have the suits picked up at the delivery site.  We will examine the suits to see what exactly is the problem."  *Id.*

On February 11, 2011, Jerry Langan advised the contracting officer that U.S.I.A. had not received the suits back to test them and that was "an issue seeing as how we are required to send back the cure notice within the 15 days."  (A4-5, 144.2)

On February 11, 2011, U.S.I.A. responded to the cure notice with a letter dated February 10, 2011.  (A201)  U.S.I.A. indicated that, after consulting with

Stedfast, U.S.I.A.'s seam tape supplier, U.S.I.A increased the temperature on the seam tape sealing machines from 475 to 500 degrees. *Id.*

With regard to the ripping neck seals, U.S.I.A. indicated it began bar tacking all of the seals. *Id*. U.S.I.A. advised USCG that it would bar tack the wrist seals although no complaints were made regarding those seals. *Id*.

U.S.I.A. proposed sending five suits to USCG for evaluation before sending the bulk of the dry suits. (A5, 201) U.S.I.A. said that "[o]ne thing we would like to do is have a USIA representative come out to Yorktown and assist and observe the testing of these suits after they have been received by the US Coast Guard. We feel this is extremely important to make sure that everyone is comfortable and confident in our suits." (A5, 201-02) U.S.I.A. also invited, at U.S.I.A.'s expense, the technical representative of USCG to come to Oregon to observe U.S.I.A.'s manufacturing and testing procedure. (A5, 202)

U.S.I.A. received the 120 suits from USCG on February 14, 2011. (A5, 202)

On February 15, 2011, Jerry Langan asked the contracting officer if USCG had "decided anything" and reminded him that U.S.I.A., in its letter of February 10, 2011, said it "would like to send out some suits for the CG to test." (A202) On February 15, 2011, the contracting officer responded that he wanted "to employ an independent testing operation to test and evaluate a representative sample of the 100 suits", which U.S.I.A. had delivered on January 27, 2011, because the

independent testing "may aid me in determining which course of action is best for the government." (A146, 202)

Later on February 15, 2011, in an email to the contracting officer, Jerry Langan questioned why USCG had not returned the 100 suits delivered on January 27, 2011; pointed out that, in reference to the 120 returned dry suits, U.S.I.A. had reinforced the areas around the zippers and other places and tested them; and requested that USCG agree to U.S.I.A. sending USCG samples of the reinforced suits for testing:

> We had asked the Coast Guard to send back the additional 100 suits that were sent out. We wanted to reinforce the suits and seals before additional testing. The CG said that they wanted to hold on to those suits and test them. I'm not sure why.
>
> Would it be possible for (sic) to send additional suits for testing? Maybe a couple of each size just to assure the CG that we have corrected any issue the suits may have had? Mind you that we tested these suits after reinforcing the areas around the zippers and other places. We've also been using the CG method while testing these suits.

(A145-46) Instead of responding to Jerry Langan, the contracting office directed the USCG personnel holding the 100 dry suits not to send the 100 suits back to U.S.I.A. (A145)

On February 16, 2011, Jerry Langan sent an email to the contracting officer, asking, if USCG had "a timetable on when a decision is going to be made?" (A202) He indicated that U.S.I.A. had "all of the 100 (sic, 120) suits back and we would like to start the process of getting those ready to ship back for evaluation."

14

(A202)  Jerry Langan also said, "we still would like to have the additional 100 suits sent back so we can evaluate those and have the neck and wrist seals bartacked."  (A202)  On the same day, the contracting officer responded by reiterating "[o]ur goal is to set up independent testing of a sample of the suits provided, and a sample of the suits that you have reinforced"—that is the modified suits from the shipment of January 19, 2011 (pre-cure) and the suits reinforced following the cure notice of February 1, 2011 (post-cure)  (A5, 202)  On the same day, Jerry Langan replied:  "Just let me know what sizes and how many you would like us to send."  (A202)

The contracting officer acknowledged that he received a lot of emails from Jerry Langan after the testing on January 18, 2011 and January 24, 2011 and he did not respond to many of them on the advice of counsel.  (A34)

The unrebutted testimony of Kimberly Johns, the President of U.S.I.A., was that he called the contracting officer six times, leaving him messages each time, and the contracting officer did not return any of the phone calls.  (A91)

The contracting officer was aware that U.S.I.A. reinforced the suits.  (A32, 35, 146)   The contracting officer was also aware that U.S.I.A. was incurring significant costs and was financially strained.  For example, on March 31, 2011, Jerry Langan sent the contracting officer and USCG's Thomas Dardis an email pointing out that U.S.I.A. had 700 nearly completed suits on its production floor,

U.S.I.A. had spent "a tremendous amount of money" on the Order, U.S.I.A. was experiencing "severe financial strain", USCG had neither returned the 100 suits for evaluation nor paid the $59,900 invoice for the 100 suits, U.S.I.A. had corrected the perceived issues with the suits, and U.S.I.A. had not heard from USCG in nearly two months since U.S.I.A. sent its response to the cure notice.  (A203)  No one from USCG responded.  (A203)

The contracting officer did not respond to requests of May 10, 2011, May 26, 2011, June 16, 2011 or July 8, 2011 for updates on what was happening and for the return of the 100 suits or the payment of the invoice for $59,900.  (A204-05)

On May 26, 2011, the contracting officer notified Jerry Langan that U.S.I. A. had to send 25 dry suits to the Navy for testing.  (A204)  On June 22, 2011, the contactor was instructed to send 25 dry suits, no later than July 6, 2011, to the U.S. Navy Experimental Diving Unit ("NEDU") in Panama City, FL for testing.  (A205)

Although USCG did not provide U.S.I.A. with a copy of the videos of the January 18 and 24, 2011 testing (A32), the Navy's Terry Davis stated in an email of May 26, 2011 to USCG's Lerna Shafakian that CWO Pettigrew had provided the Navy with a copy of the videos.  (A154)  CWO Pettigrew testified that he did not recall sending the videos to the Navy, but explained that he would have sent them to the Navy to show how the USCG did the testing because he did not believe the

Navy tested suits the same way. (A43) The maintenance procedure card (Maintenance Procedure) is the commandant instruction that tells how to test the suits while the videos show how the USCG did the testing. (A43)

USCG agreed to pay the Navy $7,000.00 for the testing and report. (A154)

On June 30, 2011, Jerry Langan advised the contracting officer in an email that U.S.I.A. had tested each of the 25 post-cure suits it would send to the Navy: "We have individually tested all of these suits using the Coast Guard standard and have not detected any leaks." (A161) Jerry Langan testified that when he was helping in the testing of the 25 post-cure suits that U.S.I.A. sent to the Navy, there was some perspiration in the shoulder areas, but under the fleece there was no moisture (bone dry). (A74)

In the same email of June 30, 2011, Jerry Langan asked to have a representative present during the testing. (A74, 205) He also requested the return of 100 suits for which USCG had not paid. (A74, 205) On July 7, 2011, USCG's Lerna Shafakian responded to Jerry Langan's email of June 30, 2011 stating, "Neither USCG personnel, nor USIA personnel will be present during the testing. Please do send suites (sic) as required at your earliest convenience as these were requested by the Navy no later than July 6th." (A205)

U.S.I.A. sent the Navy 25 post-cure suits and USCG sent the Navy 12 pre-cure suits. (A155, 204-05)

On July 25, 2011, the Navy conducted testing of the U.S.I.A. dry suits. (A206)

The Navy immersion tested 10 pre-cure suits and 10 post-cure suits.  (A206) The pre-cure suits referred to the 100 suits shipped by U.S.I.A. on January 19, 2011 and received by USCG on January 27, 2011.  (A206)  The post-cure suits referred to the 25 suits the Navy received from U.S.I.A. on July 6, 2011.  (A206)

The parties agreed that testing of the suits required compliance with the User Manual.  (A193, 197-98)  USCG asserted that it complied with the User Manual. (A49, 197-98)  The User Manual requires compliance with the Rescue and Survival Systems Manual with regard to the use of thermal undergarments.  (A195)

For the testing performed by the U.S. Navy on July 25, 2011, "the water temperature was 80 degrees (F) and the ambient air temperature was 78-80 degrees (F)."  (A206) The undergarments worn during the testing by the Navy were as follows:

Rocky Thermal Underwear
65% COTTON and 35% POLYESTER (PRE-SHRUNK) DISTRIBUTED BY:
M.H. MFG P.O.BOX 31547 CHARLOTTE, NC 28209
RN # 66008
MADE IN TAIWAN
National Stock Number unavailable

(A206)   Consistent with the above list and contrary to the prohibition on using cotton undergarments with the suits, Randolph Lawson testified that the Navy divers wore cotton long johns.  (A55)

The 78-80 degree (F) air temperature exceeded the 70 degree (F) maximum air temperature at which the dry suits are useable.   Paragraph 1.1 of the specifications for the suit produced by U.S.I.A. under the IDIQ or Headquarters Contract, which was the same suit as that produced by U.S.I.A. under the Order (A189-90), stated that the suit "shall be useable in air temps of -30F to 70F". (A187)

Dry suits are worn with layer l and 2 undergarments when the air and water temperature are below 50 degrees Fahrenheit.  (A101).  CWO Shea testified that the suits are used in "extreme cold weather . . . or the water temperature and the air temperature are at certain degrees, it's to prevent hypothermia."  (A49)

The Rescue and Survival Systems Manual states "Cotton shall not be worn as first layer protection.  Cotton absorbs and retains moisture, robbing body heat and can cause rapid onset of hypothermia."  (A102)   CWO Shea agreed that the preceding warning indicates that cotton absorbs moisture.  (A53)  He testified that it is most likely that cotton will absorb condensation from perspiration in a dry suit. (A53)  Kimberly Johns testified that, if one follows the USCG standards of testing

the suits at 50 degrees water and air temperature, the moisture from perspiration would be minimal.  (A92)

Jerry Langan testified that wearing cotton at the water and air temperatures at which the Navy conducted testing invited marring of test results through perspiration of the Navy divers.  (A70).  Jerry Langan testified that U.S.I.A. advised USCG that cotton should not be worn underneath the suits because, as soon as a person perspires, the cotton is wet (A71) and USCG prohibits the use of cotton as an undergarment.  (A71)  Putting on a suit is a bit of a workout.  (A71)  You get sweaty just putting on a dry suit according to Jerry Langan.  (A79)  Jerry Langan, who was just sitting, was perspiring in the courtroom where the temperature was lower than the air temperature for the tests.  (A79)  Jerry Langan testified that, when you are in a closed system, you sweat.  (A80)  Kimberly Johns testified that, although people perspire differently, everyone standing on a pool deck in 85 degrees in a closed system (dry suit) wearing a cotton T-shirt would have some sort of perspiration, with some being soaked.  (A90)  Kimberly Johns further testified that once you put water on cotton it spreads fast.  (A92)  If you put one drop on his cotton shirt it will spread out within a couple of minutes to form a spot of three or four inches.  (A92)

The Navy videotaped a portion of the testing.  (The video is item 20 of the Appendix)  Randolph Lawson, who supervised the Navy testing, claimed that a more thorough inspection of the dry suits occurred off camera.  (A62)

The record shows that the Navy did not fully differentiate between the two samples (pre-cure and post-cure) during its testing.  (A8)  Further, the video of the testing shows only 18 of the 20 suits tested and confusion as to whether the undergarments were wet.

The Rescue and Survival Systems Manual (A105-06) and User Manual (A193-94) require the use of fingers to stretch the wrist and neck seals while donning the suit.  The video does not show the Navy divers donning the dry suits so the record does not show that the Navy divers used their fingers to stretch the seals to avoid tearing.

The User Manual requires the wearer to "[m]ake sure the relief zipper is closed", "[m]ake sure the lightweight zipper is fully shut", and "[a]lways do a final check to make sure your seals are sealed, your zippers are shut . . ."  (A194)

The Rescue and Survival Systems Manual requires that "a fellow crewmember double check slide fastener to ensure it is closed completely against the sealing plug."  (A106)  The Navy did not comply with this requirement because, during the tests, the Navy divers were advised to check the seating of the zippers after one diver appeared to be wet from the zipper area.  (Appendix item 20, video at 8:52-9:04)  In response to this advice, a diver walking down the ladder says "Oops, hold on" (Appendix item 20, video at 8:57) and walks back up the

ladder.  Failure to seat the zipper would have allowed pool water to enter the suit and cause wetness of the undergarments from the waist down.

The video indicates that the Navy did not towel water off the outside of the suits before opening them. (Appendix, item 20*, passim*)

With regard to seepage around the neck and wrist, Randolph Lawson testified that he was **not** one hundred percent certain that there was no seepage from the neck and wrist (sleeve) seals.  (A55)  In fact, the Navy video indicates that the second post-cure suit leaked from the neck seal.  (Appendix, item 20 at 6:32  ("He's leaking right on the chest, but we are thinking that is probably the neck dam.  I'm thinking it is the neck dam, not your suit"; 6:44  ("It is wet but it looks like it is coming from here. . .the neck dam")

The video of the Navy testing shows the Navy could not tell the difference between perspiration and water on the cotton long johns.  (Appendix, item 20 video at 5:43-5:48)

The Maintenance Procedure defines leak and serious leak and indicates minor seepage aground the seals is normal:  "Minor seepage aground the wrist and neck seals is normal and does not indicate a leak.  Isolated water soaked spots on the undergarment, or soaked socks, indicates a leak.  Flooding into the dry suit socks indicates a serious leak."  (A130)  The Navy used a more stringent standard. Randolph Lawson, who supervised the testing for the Navy, testified that (1) if a

Navy diver had "a little wet spot", the Navy would "call it a leak." (A65)  He also testified that the Navy considered "a tiny wet spot along the zipper" a leak.  (A65)  He also testified that, if the Navy "detected any moisture, it was a leak."  (A65)

On or about August 8, 2011, the Commanding Officer, NEDU, issued a report of testing stating that 20 suits were tested on July 25, 2011 and nineteen (19) of the suits leaked from the waist down and 100% experienced some other level of suit leakage.  (A206)

The Navy report indicated there were three slight tears on the left wrist for the pre-cure suits and one large tear on the left wrist for the post-cure suits (A163-64), which U.S.I.A. had reinforced by bartacking them.  (A201)  But the video of the Navy testing shows the Navy divers wearing watches on their left wrists contrary to the requirement to remove watches as stated in the User Manual (A193) and the Rescue and Survival Systems Manual.  (A105)

The Navy reported one large neck tear and one slight neck tear on the pre-cure suits and no tears for the post-cure neck seals, which U.S.I.A had reinforced by bartacking them.  (A201)

The contracting officer testified that the Navy followed the proper testing procedures "[b]ecause the [Navy's] report says they did and the video indicates that they did."  (A36)

On September 1, 2011, the contracting officer issued a show cause notice to U.S.I.A. for the Order.  (A176-80, 206)  The show cause notice informed U.S.I.A. of the results of the Navy tests and asserted that a cure had not been performed as required by the February 1, 2011 cure notice.  (A206)  It further informed the contractor the Government was considering terminating the contract for cause.  (A206)  USCG rejected the 100 suits delivered on January 27, 2011 in its show cause notice of September 1, 2011.  (A206)

Kimberly Johns responded to the show cause notice by (1) email on September 7, 2011; (2) an undated letter sent by FedEx and received by USCG on September 8, 2011; and (3) an additional email on September 9, 2011.  Kimberly Johns advised USCG that the Order exceeded the maximum ordering limit of its GSA contract and that the company was exercising its option to decline the Order.  (A207)  Kimberly Johns also pointed out that U.S.I.A. was declining the Order because USCG had not paid for any of the items under the Order.  (A207)  This was a reference to USCG's failure to pay for the 100 dry suits delivered to USCG on January 27, 2011.  (A207)

In the undated letter, Kimberly Johns formally responded to the show cause notice, stating in pertinent part that U.S.I.A. no longer wished to work with USCG on the Order because of USCG's lack of cooperation:

> The inability of the United States Coast Guard to cooperate and communicate with USIA in opening a meaningful dialog, not returning

phone calls, not answering e-mails, not involving us in the process in a timely manner has led us to this point.  I am happy to discuss this matter with any authorized Coast Guard representative at any time.

(A169)

On September 16, 2011, the Contracting Officer issued Notice of Termination for Cause to terminate the Order.  (A207)  USCG terminated the Order on September 16, 2011 because "the suits repeatedly failed testing and inspection procedures with such problems as leakage from the seams and tearing at the seals."  (A177, 206)

On September 16, 2011, USCG issued Modification P00002 to the Order pursuant to FAR 8.406-4 to completely terminate the Order for cause.  (A207)

USCG returned 88 of the 100 suits on September 19, 2011.  USCG has not paid for any of the 100 suits.  (A207)

Following the termination, U.S.I.A. has not provided USCG with any further suits pursuant to the Order.  (A207)

## SUMMARY OF ARGUMENT

U.S.I.A.'s Jerry Langan was surprised to hear that three of the 120 dry suits delivered on January 7, 2011 leaked at the relief (crotch) zipper, responding to that news by saying that "[t]his is the first time I have ever heard of an issue with the relief zipper in five years of making the suits.  (A193)  He was also flabbergasted to hear that most of the 120 dry suits delivered on January 7, 2011 failed a leak

test. (A198)  His reaction was understandable where the suits had been in service for nearly five years. (A198)  Over a five-year period from September 28, 2006 to September 29, 2011, U.S.I.A. successfully delivered 4,754 of the same suits to USCG under its IDIQ or Headquarters Contract. (A2, 186, 189)  At the time of the trial on May 14, 2013, U.S.I.A. had also sold the same suit to the USCG Port Security units, the U.S. Marine Corps, the FBI, and numerous state agencies and "never received any complaints from any of those agencies about the performance of their suits." (A68)

Naturally, Jerry Langan questioned whether the tests had been properly conducted by USCG on January 18 and 24, 2011. (A3, 132, 193)  However, the contracting officer, at the advice of counsel, did not respond to many of U.S.I.A.'s emails following the testing of January 18 and 24, 2011. (A34)

Although USCG did not provide U.S.I.A. with a copy of the videos of the January 18 and 24, 2011 testing (A32), it felt it was important to provide the Navy with a copy of the videos (A154) because the videos show how the USCG did the testing. (A43)  Jerry Langan had pleaded with the contracting officer to tell him how USCG had conducted the testing and provide the specifics relating to the leak failures (A3-5, 132, 144.1-144.2, 193, 198, 199), but the contracting officer ignored his pleas.

The contracting officer had already decided to terminate the Order, as evidenced by the purchase of replacement suits from Kokatat on January 28, 2011 and subsequent purchase of more replacement suits from Kokatat on April 20, 2011. (A4-5, 199, 203, 207-08)

After receiving the cure notice of February 1, 2011 and with only a very general description from USCG regarding the nature of the alleged leaks (A32), U.S.I.A. reworked the 120 suits returned by USCG to solve any possible leak problems. (A203) The contracting officer was aware that U.S.I.A. reinforced the suits. (A32, 35)

U.S.I.A. offered to witness USCG testing of five dry suits it reinforced after receiving the cure notice of February 1, 2011 ("post-cure suits") (A33). However, USCG rejected this reasonable suggestion because the contracting officer, in consultation with legal counsel sought evidence from a third party, the Navy, in case there was a dispute. (A31, 35)

The only testing relevant to the termination is the Navy testing of the post-cure suits. However, the record shows that the Navy did not fully differentiate between the two samples during its testing (A8). Further, a video of the testing shows only 18 of the 20 suits tested and confusion as to whether the undergarments were wet and therefore indicated a leak. (Appendix, item 20) Randolph Lawson,

who supervised the Navy testing, claimed that a more thorough inspection of the dry suits occurred off camera.  (A62)

In sum, the facts show that U.S.I.A. diligently tried to resolve the alleged leakage problem and USCG acted evasively and failed to cooperate.  The contracting officer was more interested in working with legal counsel in building a case for terminating the Order than in cooperating with U.S.I.A.

The entire litigation could have been avoided and the matter resolved quickly and efficiently if USCG had accepted U.S.I.A.'s offer to test five reinforced suits with U.S.I.A.'s personnel observing the tests.  USCG could have saved the $7,000 it paid the Navy for the testing and months of delay obtaining the testing.  (A154)

The CBCA only addressed the issue of whether USCG proved the dry suits leaked, but indicated it considered all arguments set forth in U.S.I.A.'s briefs. (A9).  Because the CBCA made no fact findings relating to the other arguments, the Court should give no deference to the CBCA's conclusion that there was no merit to those arguments.  U.S.I.A. addresses only four of the arguments it presented at the trial level.

I.    **THE ORDER CONSTITUTED AN OPTION CONTRACT THAT U.S.I.A. DECLINED TO COMPLETE PRIOR TO THE PURPORTED TERMINATION**

Because U.S.I.A. did not sign the Order (A107), it was a unilateral purchase order constituting an offer by USCG, which U.S.I.A. could accept by delivering supplies in accordance with the terms and conditions of the offer. *Comptech Corporation*, ASBCA No. 55526, 2008-2 B.C.A. (CCH) P33,982, 167-168, 2008 ASBCA LEXIS 76 (October 1, 2008). By delivering a significant number of dry suits and manufacturing many more, U.S.I.A. substantially performed, as defined in FAR 13.004(b); therefore, an option contract was established. *Id*. While the option contract disabled USCG from revoking the offer, U.S.I.A. was not bound to complete its performance. *Id*.

Prior to USCG's purported termination of the Order on September 16, 2011, U.S.I.A notified USCG that it declined to continue performance. In response to the cure notice of September 1, 2011(A165), on September 7, 2011, Kimberly Johns advised USCG that U.S.I.A. was declining the Order because (1) the Order exceeded the maximum order limit under the FSS Contract; and (2) USCG had not paid for any of the items under the Order and. (A207) The second point was a reference to USCG's failure to pay for the 100 suits delivered to USCG on January 27, 2011. (A207) Prior to September 16, 2011, in a letter in response to the cure notice (A165), Kimberly Johns also indicated that "U.S.I.A. is declining the order"

29

because of USCG's failure "to cooperate and communicate with USIA in opening a meaningful dialog, not returning phone calls, not answering e-mails, not involving us in the process in a timely manner has led us to this point." (A169) Accordingly, U.S.I.A. cancelled the option contract prior to September 16, 2011 when USCG purported to terminate the Order.

## II.    USCG BREACHED THE ORDER BY PURCHASING SUITS FROM ANOTHER CONTRACTOR

USCG materially breached the Order by purchasing, prior to the purported termination of the Order on September 16, 2011 or cancellation by U.S.I.A. on September 7, 2011, suits from Kokatat that replaced 54.44 percent (423/777 X 100) of the suits under the Order. *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) ("[W]e conclude that removal of 15.89% of the timber initially contracted for, at this stage of contract performance, was a material breach by the United States.").

## III.    USCG MATERIALLY BREACHED THE ORDER BY FAILING TO MEET ITS DUTY OF GOOD FAITH AND FAIR DEALING BY ACTING EVASIVELY AND FAILING TO COOPERATE WITH U.S.I.A.

USCG materially breached the Order by failing to meet its duty of good faith and fair dealing by acting evasively and failing to cooperate with U.S.I.A. where USCG (1) failed to respond to inquiries from U.S.I.A. and provide details relating to testing methodology and test results; (2) unreasonably failed to accept U.S.I.A's

offer to test five reworked suits with U.S.I.A. observing and instead insisting on the Navy testing suits without U.S.I.A. in attendance; and (3) purchased replacement dry suits before termination of the Order.

Even if the Order was not an option contract, but a bilateral contract, U.S.I.A. was justified in early September 2011 in refusing to continue performance (A169, 171-72) because of USCG's breach of the duty of good faith and fair dealing. *Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir. 1988), *modified*, 857 F.2d 787 (Fed. Cir. 1988) (The government's failure to cooperate constitutes a material breach of contract, giving the contractor the right to discontinue performance of the contract.).

## IV. USCG FAILED TO ESTABLISH THAT U.S.I.A.'S DRY SUITS LEAKED BECAUSE THE NAVY IMPROPERLY TESTED THE DRY SUITS

The Navy professed to follow the Maintenance Procedure, but failed to properly test the suits because ((1) the Navy failed to test the suits as part of a cold weather system by failing to test at a proper temperature using the right undergarments; (2) the Navy used too stringent a test standard; (3) the Navy divers wore watches that caused or contributed to the tearing of a wrist seal; (4) the zippers were not always seated; and (5) the Navy improperly counted leakage from the seals as a failure. Any alleged failures to pass the leak test were consistent with the Navy's failures noted in the preceding sentence.

While USCG may have presented a *prima facie* case that the dry suits leaked by virtue of the Navy testing on July 25, 2011, U.S.I.A. rebutted the *prima facie* case by presenting evidence that (1) it successfully tested the same 25 post-cure dry suits that the Navy tested, with no leaks (A8, 161); and (2) as noted above, the Navy's test procedures and standards were improper and therefore inaccurately indicated leaks.  The burden then shifted back to USCG to demonstrate that the testing procedure conformed to the requirements of the User Manual and the Maintenance Procedure, which it could not, and did not, do.  The CBCA erroneously kept the burden on U.S.I.A to show that the Navy's testing procedures were improper.  (A9)

Moreover, the CBCA decision uses the words "wet" and "damp" interchangeably.  (A8-9)  The Maintenance Procedure requires a "soaked" spot to establish a leak.  (A129-30)  The CBCA's decision cannot stand because testing that results in damp undergarments or even wet undergarments does not mean the suits leaked where the Maintenance Procedure requires a "soaked" spot.

## ARGUMENT

### I.    STANDARD OF REVIEW

Pursuant to section 7107(b) of the Contract Disputes Act, "the decision of the agency board on a question of law is not final or conclusive; but the decision of the agency board on a question of fact is final and conclusive and may not be set

aside unless the decision is fraudulent, arbitrary, or capricious; so grossly erroneous as to necessarily imply bad faith; or not supported by substantial evidence." It is U.S.I.A.'s burden on appeal to show that the CBCA's decision is not supported by substantial evidence. *Nuclear Research*, 814 F.2d 647, 650 (Fed. Cir. 1987).

## II.     <u>BURDEN OF PROOF</u>

A default-termination is a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence:

> As was stated in *J. D. Hedin Constr. Co. v. United States*, 187 Ct. Cl. 45, 408 F.2d 424, 431 (1969), a default-termination is a drastic sanction (see *Schlesinger v. United States*, 390 F.2d 702, 709, 182 Ct. Cl. 571, 584 (1968)) which should be imposed (or sustained) only for good grounds and on solid evidence."

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). The government bears the burden of proof with respect to whether a termination for default was justified. *Lisbon*, 828 F.2d 759, 765.

The government may establish a *prima facie* case of the correctness of a default termination by submitting test results showing that supplies furnished do not conform to the specifications. *Nuclear Research*, 814 F.2d 647, 650. If the Government submits test results showing that supplies do not conform to the specifications, the burden simply shifts to the contractor to come forward with evidence showing that the supplies furnished are in substantial compliance with the

contract or that the Government's test results are faulty.  *Astro Science Corp. v. United States*, 471 F.2d 624, 627 (Ct. Cl. 1973); *Praoil, S.r.L.*, ASBCA Nos. 41499**,** 44369, 94-2 B.C.A. (CCH) P26,840, 133, 1994 ASBCA LEXIS 89, \*\*21 (March 31, 1994).  Where the contractor comes forward with such evidence, the burden shifts back to the Government.  *Praoil, S.r.L.*, 94-2 B.C.A. (CCH) P26,840, 133, 1994 ASBCA LEXIS 89, \*\*22 ("If the contractor comes forward with such evidence, the burden again shifts to the Government to demonstrate that the testing procedure conformed with applicable requirements.  *Technical Associates, supra*, at 74,683; *see Nuclear Research Corp.*, ASBCA No. 28641, 1986 ASBCA LEXIS 763, 86-2 BCA 18,953, *aff'd*, 814 F.2d 647 (Fed. Cir. 1987); *W.C. Fore Trucking, Inc., supra*, at 110,003; *Arden Engineering Co.*, ASBCA No. 24829, 1983 ASBCA LEXIS 370, 83-2 BCA P 16,603 at 82,553.").

## III.    THE ORDER CONSTITUTED AN OPTION CONTRACT THAT U.S.I.A. DECLINED TO COMPLETE PRIOR TO THE PURPORTED TERMINATION

Because U.S.I.A. did not sign the Order (A107), it was a unilateral purchase order constituting an offer by USCG, which U.S.I.A. could accept by delivering supplies in accordance with the terms and conditions of the offer.  *TTF, L.L.C.*, ASBCA Nos. 58495, 58516, 2013-1 B.C.A. (CCH) P35,403, 173, 2013 ASBCA LEXIS 81 (September 3, 2013); *Comptech*, 2008-2 B.C.A. (CCH) P33,982, 167-168; *Crewzers Fire Crew Transp., Inc. v. United States*, 111 Fed. Cl. 148, 158

34

(Fed. Cl. 2013), *affirmed*, 741 F.3d 1380 (Fed. Cir. 2014) (With respect to a blanket purchase agreement, the court noted that "FAR 13.004 states that 'issuance by the Government of an order in response to a supplier's quotation does not establish a contract. The order is an offer by the Government to the supplier to buy certain supplies or services upon specified terms and conditions. A contract is established when the supplier accepts the offer.' 48 C.F.R. § 13.004.").

By making its first delivery on or about November 10, 2010 (A191), U.S.I.A substantially performed, as defined in FAR 13.004(b); therefore, an option contract was established. *Comptech*, 2008-2 B.C.A. (CCH) P33,982, 167-168. While the option contract disabled USCG from revoking the offer, U.S.I.A. was not bound to complete its performance:

> The principal legal consequence of an "option contract" is that it limits an offeror's power to revoke its offer. RESTATEMENT (SECOND) OF CONTRACTS § 25; see FAR 13.004(b), (c), 13.302-4. Under an option contract, the offeree is not bound to complete its performance. RESTATEMENT (SECOND) OF CONTRACTS §§ 37 cmt. a, 45 cmt. e. The offeror alone is bound, but its duty of performance is "conditional" on the offeree's "acceptance," *i.e*, completion or tender of the invited performance in accordance with the terms of the offer. *Id*. §§ 37 cmt. b, 45(2), 224, 225; see FAR 13.004 (when supplier accepts offer, contract established). The major element differentiating an option [*168,083] contract from all other contracts is that the optionee (option holder) has both the legal power to accept a second contract for the contemplated exchange and the legal privilege of not exercising that power. The optionor (option giver), on the other hand, has liability to become bound to execute the exchange and also a disability to avoid it. ERIC MILLS HOLMES, CORBIN ON CONTRACTS § 11.1 (rev. ed. 2007).

*Id*.

Prior to USCG's purported termination of the Order on September 16, 2011, U.S.I.A notified USCG that it declined to continue performance.  In response to the cure notice of September 1, 2011(A165), on September 7, 2011, Kimberly Johns advised USCG that U.S.I.A. was declining the Order because (1) the Order exceeded the maximum order limit under the FSS Contract; and (2) USCG had not paid for any of the items under the Order and.  (A207)  The second point was a reference to USCG's failure to pay for the 100 suits delivered to USCG on January 27, 2011.  (A207)  Prior to September 16, 2011, in a letter in response to the cure notice (A165), Kimberly Johns also indicated that "U.S.I.A. is declining the order" because of USCG's failure "to cooperate and communicate with USIA in opening a meaningful dialog, not returning phone calls, not answering e-mails, not involving us in the process in a timely manner has led us to this point."  (A169) Accordingly, U.S.I.A. cancelled the option contract prior to September 16, 2011 when USCG purported to terminate the Order.

## IV.  USCG BREACHED THE ORDER BY PURCHASING SUITS FROM ANOTHER CONTRACTOR

On January 28, 2011 and April 20, 2011, USCG breached the Order by issuing two delivery orders to Kokatat, Inc. (Kokatat) for a total of 482 suits, with 423 of those suits purchased as *replacement* suits at a cost of $380,172.10 to cover suits under the Order.  (A199, 203, 207-08)  It was a breach of the Order for USCG to transfer requirements of the Order to Kokatat.

However, the CBCA asserted that it would have been improper for USCG to make such purchases before the Navy testing on July 25, 2011 so the suits purchased from Kokatat could not have been replacement suits. (A10) The CBCA is either saying that USCG inadvertently stipulated that it purchased replacement suits from Kokatat or the contracting officer cannot make a mistake of law. The CBCA would be wrong on both points. First, a contracting officer is authorized to make a mistake of law. *Broad Ave. Laundry & Tailoring v. United States*, 681 F.2d 746, 748-49 (Ct. Cl. 1982).

Second, USCG did in fact purchase *replacement* suits from Kokatat. USCG asserted, in its complaint, its amended complaint and the parties' stipulations of fact, that it bought 423 suits from Kokatat as *replacement* suits for those included in the Order. U.S.I.A. raised the breach issue as an affirmative defense in its answer to the amended complaint. The CBCA allowed USCG to respond to the affirmative defenses in the answer. In Respondent's Answer to Appellant's Affirmative Defenses, USCG recited U.S.I.A.'s affirmative defense (A210-11) and then asserted it had the right to acquire *replacement* suits from Kokatat because the Order was not a requirements contract. (A211) Further, USCG stated that the contracting officer purchased the replacement suits under the warranty paragraph of the contract (paragraph E7). (A211-12)

37

The issue of warranty never arose because USCG never accepted any of the suits.  In the cure notice of February 1, 2011 delivered on January 7, the contracting officer notified U.S.I.A. that USCG rejected the 120 suits.  (A138)  USCG also rejected the 100 suits delivered on January 27, 2011 in the show cause notice of September 1, 2011.  (A206)

The two breaches should be considered together in determining whether a material breach occurred because the Order was not divisible where only one delivery date existed at any time.  *Stone Forest*, 973 F.2d 1548, 1552-53 ("The materiality of a breach is determined in light of the totality of events and circumstances. Restatement (Second) § 241 cmt. a.  It is incorrect to measure each contributing element separately and, finding it small, remove it from the equation. Whether removal of units 8 and 9 alone, or units 11 and 14 alone, was material, is not the measure.  It is the total affected volume that must be considered.").

A breach is less likely to be regarded as material if it occurs late, after substantial performance, and more likely to be regarded as material if it occurs early.  *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) (citing to Restatement (Second) § 241 cmt. d.).  USCG's breach occurred during the early stages of performance of the Order; therefore, the breach was material.  When USCG purchased the Kokatat suits, U.S.I.A. was in the early stages of performance because it had delivered only 220 suits, which is 28.31

percent of the 777 suits. Considering that USCG had accepted none of the 220 suits and returned the first delivery of 120 suits, U.S.I.A. had completed zero percent of the Order *as viewed* by USCG. In comparison, the court in *Stone Forest Industries* found a material breach where the contractor had performed 51 percent of the contract. *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548, 1552 (Fed. Cir. 1992) ("SFI had logged about 51% of the Flathead Sale at the time of the withdrawal of the four units.").

USCG materially breached the Order by purchasing, prior to the purported termination of the Order on September 16, 2011 or cancellation by U.S.I.A. on September 7, 2011, suits from Kokatat that replaced 54.44 percent (423/777 X 100) of the suits from the Order. *Stone Forest Industries, Inc. v. United States*, 973 F.2d 1548, 1551-52 (Fed. Cir. 1992) ("we conclude that removal of 15.89% of the timber initially contracted for, at this stage of contract performance, was a material breach by the United States.").

Even if the Order was not an option contract, but a bilateral contract, U.S.I.A. was justified on September 2011 in refusing to continue work because USCG materially breached the Order. *Stone Forest*, 973 F.2d 1548, 1550 ("Upon material breach of a contract the non-breaching party has the right to discontinue performance of the contract, and to seek redress in accordance with law. *Malone v. United States*, 849 F.2d 1441, 1445-46 (Fed. Cir.), *modified*, 857 F.2d 787 (Fed.

Cir. 1988); *Cities Serv. Helex, Inc. v. United States*, 211 Ct. Cl. 222, 543 F.2d

1306, 1313 (Ct. Cl. 1976); *Airco, Inc. v. United States*, 205 Ct. Cl. 493, 504 F.2d

1133, 1135 (Ct. Cl. 1974).").  U.S.I.A. did not waive the breach because USCG did

not apprise U.S.I.A. of the two replacement purchases from Kokatat until USCG

submitted its Appeal File in this litigation.  (A199, 203)  *Vt. Yankee Nuclear Power*

*Corp. v. Entergy Nuclear Vt. Yankee, LLC*, 683 F.3d 1330, 1352 (Fed. Cir. 2012)

(Judge Mayer, dissenting) (Waiver is a vague term used for a great variety of

purposes, but in any normal sense, "it connotes some kind of voluntary knowing

relinquishment of a right.").  U.S.I.A. could not waive a breach of which it was

unaware.

## V. USCG MATERIALLY BREACHED THE ORDER BY FAILING TO MEET ITS DUTY OF GOOD FAITH AND FAIR DEALING BY ACTING EVASIVELY AND FAILING TO COOPERATE WITH U.S.I.A.

The Order, which became an option contract once U.S.I.A. substantially

performed, contained a covenant of good faith and fair dealing that imposed on

each party a "duty not to interfere with the other party's performance and not to act

so as to destroy the reasonable expectations of the other party regarding the fruits

of the contract":

> The Court of Federal Claims correctly held, as well, that Lakeshore could
> not establish that the government breached the covenant of good faith and
> fair dealing.  *Lakeshore*, 110 Fed. Cl. at 240.  Every contract implicitly
> contains a covenant of good faith and fair dealing, keyed to the obligations
> and opportunities established in the contract.  *First Nationwide Bank v.*

40

> *United States*, 431 F.3d 1*342, 1349 (Fed. Cir. 2005); see Metcalf Constr. Co., Inc. v. United States*, 742 F.3d 984, 990-92 (Fed. Cir. 2014).  The covenant imposes on each party a "duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract."  *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

*Lakeshore Eng'g Servs. v. United States*, 748 F.3d 1341, 1349 (Fed. Cir. 2014).[1]

USCG materially breached the Order by failing to meet its duty of good faith and fair dealing by acting evasively and failing to cooperate with U.S.I.A. where USCG (1) failed to respond to inquiries from U.S.I.A. and provide details relating to testing methodology and test results; (2) unreasonably failed to accept U.S.I.A's offer to test five reworked suits with U.S.I.A. observing and instead insisting on the Navy testing suits without U.S.I.A. in attendance; and (3) purchased replacement dry suits before termination of the Order:

> In our view, the government materially breached this contract.  According to Restatement (Second) of Contracts § 241(e) (1981), "the extent to which the behavior of [a] party failing to perform . . . comports with standards of good faith and fair dealing" is a significant factor in determining whether that party's breach is material.  The Restatement also states that "subterfuges and

---

[1] In *Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817, 831 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011), the Court appeared to enunciate a new rule that the implied duty of good faith and fair dealing "cannot expand a party's contractual duties beyond those in the express contract."  *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) limited *Precision Pine* to reflect the traditional rule with the proviso that "an act will not be found to violate the duty (which is implicit in the contract) if such a finding would be at odds with the terms of the original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision."  This is the traditional view of the duty of good faith and fair dealing.

evasions violate the obligation of good faith," as does lack of diligence and interference with or failure to cooperate in the other party's performance. *Id.* § 205 comment d; cf. *Lewis-Nicholson, Inc. v. United States*, 213 Ct. Cl. 192, 550 F.2d 26, 32 (1977) (holding that government-caused delay in contractor performance violated implied duty not to hinder performance of other party); *Peter Kiewit Sons' Co. v. United States*, 138 Ct. Cl. 668, 151 F. Supp. 726, 731 (1957) (explaining that in every government contract there is an implied obligation on part of the government not to willfully or negligently interfere with contractor's performance).

The CO was evasive when he did not clearly state on inspecting the exemplar in December 1983, whether or not he accepted it. He further misled Malone to rely on the exemplar as a workmanship standard by failing to object to Malone's continued performance, by continuing to make progress payments to Malone, and by refusing until June 1984, to answer Malone's explicit question concerning whether the standard of workmanship had changed. The CO's evasive conduct misled Malone to perform roughly 70% of its contractual obligation in reliance on a workmanship standard the CO found unacceptable. In light of the [*1446] CO's evasiveness, and the consequent interference this caused in Malone's performance, the government's conduct in this case rises to the level of a material breach of contract.

*Malone*, 849 F.2d 1441, 1445-46.

Even if the Order were not an option contract, but a bilateral contract, U.S.I.A. was justified on September 2011 in refusing to continue performance (A169, 171-72) because of USCG's breach of the duty of good faith and fair dealing. *Malone*, 849 F.2d 1441, 1445-46 (The government's failure to cooperate constitutes a material breach of contract, giving the contractor the right to discontinue performance of the contract.).

## A. USCG Failed To Respond To Inquiries From U.S.I.A. And Provide Details Relating To Testing Methodology And Test Results

Where U.S.I.A. had been delivering the same suit to USCG for almost five years, Jerry Langan naturally questioned whether the tests had been properly conducted on January 18 and 24, 2011.  (A3, 132, 193)  However, the contracting officer, at the advice of counsel, did not respond to many of U.S.I.A.'s emails following the testing of January 18 and 24, 2011.  (A29)

Further, on January 27, 2011, the contracting officer told U.S.I.A. the parties would have a conference early the next week.  (A3, 197-98)  The contracting officer never held the conference call despite requests by Jerry Langan on January 27, 2011 (A198), January 31, 2011 (A199) and February 1, 2011(A4, 144.1) that the contracting officer honor his promise.

Other than the limited test results provided with the cure notice of February 1, 2011, USCG did not otherwise provide any details relating to the testing methodology and the specific locations of the alleged leaks.  This was so despite Jerry Langan's requests for specific details regarding the alleged leaks on January 27, 2011 (A198) and on February 1, 2011.  (A4, 144.1)

Although USCG did not provide U.S.I.A. with a copy of the videos of the January 18 and 24, 2011 testing (A27), USCG felt it was important to provide the Navy with a copy of the videos.  (154)  As it turned out, the contracting officer, in consultation with legal counsel, was collecting evidence for a termination for cause

43

and making no effort to cooperate with U.S.I.A. in obtaining a dry suit that passed the leak test in the Maintenance Procedure.

On February 2, 2011, the contracting officer told Jerry Langan that the test results were included with the cure notice of February 1, 2011. The same day Jerry Langan advised the contracting officer that U.S.I.A. had received the cure notice and had "issued a call tag to have the suits picked up at the delivery site. We will examine the suits to see what exactly is the problem." (A4, 144.1)

However, because the contracting officer insisted that U.S.I.A. respond to the cure notice by February 15, 2011 (A4, 144.1) and U.S.I.A. did not receive the suits back until February 14, 2011 (A5, 202), U.S.I.A. was unable to "examine the suits to see what exactly is the problem" before responding to the cure notice.

Notwithstanding having very little input from USCG with regard to the nature of the alleged leaks and not being able to examine the 120 dry suits, U.S.I.A., working in consultation with its seam tape supplier, decided to change the temperature on its seam tape sealing machines to resolve any leakage problems with the seams. (A201) With regard to the ripping neck seals, U.S.I.A. indicated it began bar tacking all of the seals. *Id*. U.S.I.A. advised USCG that it would bar tack the wrist seals although no complaints were made regarding those seals. *Id*.

The contracting officer was aware that U.S.I.A. reinforced the suits. (A30, 146)

USCG violated its duty to cooperate by failing to respond to U.S.I.A.  *T&G Aviation, Inc.*, ASBCA No. 40428, 2000-2 B.C.A. (CCH) P31,147, 2000 ASBCA LEXIS 161, 62 (October 10, 2000) ("The implied duty to cooperate by providing information is usually applied where a contractor requests information necessary to perform and the Government either does not provide that information or does so in an untimely manner.").

USCG provided the requested information in an untimely manner where it did not provide the videos of the USCG and Navy testing until after this litigation began.  Further, U.S.I.A. was prepared to immediately test five reinforced suits, but USCG unreasonably waited over five months to July 25, 2011 (A206) to have the Navy test suits, did not obtain the results of the tests until August 8, 2011 (A206), and did not provide U.S.I.A. with the written results until September 1, 2011. (A206)  Of course, the most important results of the test were shown in the Navy video, which USCG did not provide U.S.I.A. until after the litigation began. The delay was particularly unreasonable where USCG was collecting evidence instead of working with U.S.I.A. and the contracting officer knew U.S.I.A. was incurring substantial costs trying to deliver suits.  Accordingly, USCG breached its duty of good faith and fair dealing by being evasive (*Malone*, 849 F.2d 1441, 1445) and failing to cooperate.  *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1542 (Fed. Cir. 1993) ("The government must avoid actions that unreasonably cause

delay or hindrance to contract performance.  *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988).").

### B. USCG Unreasonably Failed To Accept U.S.I.A's Offer To Test Five Reworked Suits With U.S.I.A. Observing And Insisting On The Navy Testinging Suits Without U.S.I.A. In Attendance

Instead of working with U.S.I.A., USCG was collecting evidence at the advice of counsel.

In its response to the cure notice of February 1, 2011, U.S.I.A. offered to witness USCG testing of five dry suits it reworked after receiving the cure notice of February 1, 2011 ("post-cure suits") (A28).  However, USCG decided to have the Navy test a sample of post-cure suits, along with dry suits manufactured before U.S.I.A. reworked the suits (pre-cure suits).  (A28)  The contracting officer testified that USCG wanted to test the pre-cure suits to obtain "a baseline that was independent of what the Coast Guard did"—that is, the USCG tests of January 18 and 24, 2011-- in case there was a dispute with U.S.I.A.  (A30)  In other words, the contracting officer was collecting evidence for a termination for cause rather than cooperating with U.S.I.A. as required by the duty of good faith and fair dealing.

On February 15, 2011, Jerry Langan advised the contracting officer that U.S.I.A. had reinforced the 120 suits and tested them and wanted to send a couple of each size to USCG for testing.  (A146)  Jerry Langan also told the contracting officer he was not sure why USCG was holding onto the 100 suits delivered on

January 27, 2011 and pointed out that U.S.I.A wanted to reinforce the suits and seals before additional testing.  (A146)  Instead of responding to Jerry Langan, the contracting officer told the USCG personnel who had custody of the 100 dry suits not to return them to U.S.I.A.  (A146)  This evasive action is violative of the duty of good faith and fair dealing.  *Malone*, 849 F.2d 1441, 1445

Although U.S.I.A. requested to be present at the Navy testing (A205), the contracting officer testified that, after talking to counsel, it would be best if neither USCG nor U.S.I.A. were present at the Navy testing.  (A31)  Once again, USCG was more intent on gathering evidence than in cooperating with U.S.I.A.

In the meantime, U.S.I.A. was reinforcing the suits and manufacturing more on the assumption that any problems had been fixed because it had tested the reinforced suits.  (A146)

USCG was aware that U.S.I.A was producing suits.  On January 27, 2011, Jerry Langan notified the contracting officer that U.S.I.A. had nearly 400 units ready to ship.  (A198)  On March 31, 2011, Jerry Langan advised the contracting officer that U.S.IA. had 700 nearly completed suits on its production floor.  (A203)

Although U.S.I.A. did not agree to the Navy testing, especially without U.S.I.A. representatives present for the testing, it did cooperate in providing test samples (A202, 205) because USCG was adamant in having the Navy perform the testing.

On the other hand, USCG did not cooperate with U.S.I.A because USCG was simply collecting evidence.  As noted, *supra*, the contracting officer did not tell U.S.I.A. that he directed USCG personnel not to return the 100 suits (A146) and did not respond to U.S.I.A.'s requests of May 10, 2011, May 26, 2011, June 16, 2011 and July 8, 2011for updates on what was happening and for the return of the 100 suits or the payment of the invoice for $59,900.  (A204-05)  These evasive tactics and failure to cooperate violated the duty of good faith and fair dealing.  *Malone*, 849 F.2d 1441, 1445.

If U.S.I.A. had attended the Navy testing, Jerry Langan testified that he could have ensured they wore the proper undergarments and ensured that water was wiped off the suits before opening them to avoid water dripping in the suits onto the undergarments.  (A71)  Neither the Navy in its testing nor USCG in its testing wiped off the suits.  (A71-72)

## C. USCG Purchased Replacement Dry Suits Before Termination Of The Order

By purchasing replacement suits from Kokatat instead of cooperating with U.S.I.A. and not telling U.S.I.A. about the two purchases, USCG violated the duty of good faith and fair dealing by being evasive and failing to cooperate with U.S.I.A.  *Malone*, 849 F.2d 1441, 1445-46.

## VI.    USCG FAILED TO ESTABLISH THAT U.S.I.A.'S DRY SUITS LEAKED BECAUSE THE NAVY IMPROPERLY TESTED THE DRY SUITS

USCG failed to establish by solid evidence that the Order should be terminated for cause because USCG failed to meet its burden of proof that the Navy's testing showed that the suits leaked.  The CBCA's decision that the termination for cause was proper because the suits leaked is not supported by substantial evidence.

USCG arranged for the Navy to test 10 suits produced prior to the cure notice of February 1, 2011(pre-cure) and 10 suits produced after February 1, 2011 through modified manufacturing processes (post-cure).  (A155, 204)  U.S.I.A. sent the Navy 25 post-cure suits and USCG sent the Navy 12 pre-cure suits.  (A155, 204-05)  U.S.I.A. immersion tested the 25 suits prior to sending them to the Navy and the suits did not leak.  (A74)

On August 8, 2011, the Navy issued a report to USCG claiming it had tested 10 pre-cure and 10 post-cure suits on July 25, 2011 and that all suits experienced some level of wetness.  (A162-64, 206)  The Navy tests of the post-cure suits are the only relevant tests as to whether the suits leaked or seams tore because U.S.I.A. modified its manufacturing process with respect to sealing the seams and reinforcing the seals following the cure notice of February 1, 2011.  (A201)

USCG arguably established a *prima facie* case of the correctness of the default termination by pointing to the Navy's written test results of the post-cure suits showing that the suits leaked and one wrist seal tore. The contracting officer testified that the Navy followed the proper testing procedures "[b]ecause the [Navy's] report says they did and the video indicates that they did." (A36)

U.S.I.A. rebutted USCG's *prima facie* case by coming forward with evidence showing that the supplies furnished were in substantial compliance with the contract and that the Government's test results were faulty. U.S.I.A. presented evidence showing it successfully tested the same post-cure suits prior to testing by the Navy (A74) and showing that the Navy failed to properly test the suits because (1) the Navy failed to test the suits as part of a cold weather system by failing to test at a proper temperature using the right undergarments; (2) the Navy used too stringent a test standard; (3) the Navy divers wore watches that caused or contributed to the tearing of a wrist seal; (4) the zippers were not always seated; and (5) the Navy improperly counted leakage from the seals as a failure.

Accordingly, the burden of going forward with evidence shifted back to USCG to show the suits did not meet the requirements. USCG failed to meet its burden.

The CBCA erroneously left the burden on U.S.I.A. to prove the inaccuracy of the Navy tests while the burden was on USCG to show that the Navy tests were

accurate: "While U.S.I.A. may have used a different process for testing the suits and may have reached different results, USIA, failed to present persuasive evidence that the Coast Guard's testing was improper." (A9)

USCG did not meet its burden. The record shows that the Navy did not properly conduct the tests for the five reasons noted above. Further, the Navy did not fully differentiate between the two samples (pre-cure and post-cure) during its testing (A8). Moreover, a video of the testing shows only 18 of the 20 suits tested and confusion as to whether the undergarments were wet and therefore indicated a leak. (Appendix, item 20 video)

In addition, the CBCA recognized that one could not "easily discern simply from looking at or listening to the videotape whether the damp spots were from the pool or from sweat from the individual." (A8) But the CBCA noted that Randolph Lawson testified "that the wet spots that he observed were more consistent with leaks than sweat." (A8) Even if Randolph were correct that the wet spots were more consistent with leaks than sweat, which U.S.I.A. disagrees with, the CBCA did not and could not discount that wet spots came from pool water as the CBCA indicated in the first sentence of this paragraph. Pool water came from ripped or normally seeping seals or the failure to towel off the suits or close the zippers.

The CBCA decision uses the words "wet" and "damp" interchangeably. (A8-9) The Maintenance Procedure requires a "soaked" spot to establish a leak.

51

(A129-30)  The CBCA's decision cannot stand because dry suit testing that results in damp undergarments does not mean the suits leaked.  Even a wet spot may not evidence a leak because the wet spot may not be "soaked".

**A.    The Navy Failed To Properly Test The Suits As Part Of A System**

Paragraph E.2 of the Order provided for acceptance testing in accordance with Maintenance Procedure 583020.0 REV D, dated August 8 (sic, 18), 2008 (Maintenance Procedure).  (A191)  The Maintenance Procedure is for the Maritime Cold Weather Suit System (MCWSS).  (A191, 201)  The MCWSS is discussed in the Rescue and Survival Systems Manual (A103-06), which is the same suit as the suit in litigation.  (A84)

The dry suit is part of a maritime cold weather suit system where the system is tested rather than the suit alone.  (A86)  The dry suit is part of a three layer system (A103), with the first layer being a polypropylene undergarment and the second layer a fleece insulating undergarment.  (A102)

**1.  The Navy Did Not Conduct Its Tests At A Proper Temperature**

For the testing performed by the U.S. Navy on July 25, 2011, "the water temperature was 80 degrees (F) and the ambient air temperature was 78-80 degrees (F)."  (A206)  The 78-80 degree (F) air temperature exceeded the 70 degree (F) maximum air temperature at which the dry suits are useable.  Paragraph 1.1 of the specifications for the suit produced by U.S.I.A. under the Headquarters Contract,

which was the exact same suit as that produced by U.S.I.A. under the Order (A189-90), stated that the suit "shall be useable in air temps of -30F to 70F". (A187)

Dry suits are worn with layer l and 2 undergarments when the air and water temperature are below 50 degrees Fahrenheit.  (A101).  CWO Shea testified that the suits are used in "extreme cold weather . . . or the water temperature and the air temperature are at certain degrees, it's to prevent hypothermia".  (A49)

## 2.  **The Navy Failed To Use The Proper Undergarments**

The Maintenance Procedure describes the leak test procedures, in part, as follows:

1.  Perform leak test as follows.

> a.  Have the member **don undergarments**, socks, the dry suit and boots.  A hood and gloves shall be worn if required for the local climate

(A129) (emphasis added)

The USCG's CWO Shea testified (A52-53) that the "undergarments" referenced in the Maintenance Procedure were the polypropylene and fleece undergarments required by the Rescue and Survival Systems Manual, COMDTINST M10470.10F ("Don layer 1 polypropylene followed by layer 2 fleece insulating undergarments.").  (A105)

The User Manual requires compliance with COMDTINST M10470.10E, the predecessor to COMDTINST M10470.10F, with respect to the wearing of undergarments. (A195) COMDTINST M10470.10E prescribes use of polypropylene and fleece. (A195) Both versions of the Rescue and Survival Systems Manual prohibit the use of cotton undergarments. (A195-96)

Contrary to the prohibition on using cotton undergarments with the suits, Randolph Lawson testified that the Navy divers wore cotton long johns. (A55) The Rescue and Survival Systems Manual states "Cotton shall not be worn as first layer protection. Cotton absorbs and retains moisture, robbing body heat and can cause rapid onset of hypothermia." (A102) CWO Shea agreed that the preceding warning indicates that cotton absorbs moisture. (A53) He testified that it is most likely that cotton will absorb condensation from perspiration in a dry suit. (A53)

Jerry Langan testified that wearing cotton at the water and air temperatures at which the Navy conducted testing invited marring of test results through perspiration of the Navy divers. (A70). Jerry Langan testified that U.S.I.A. advised USCG that cotton should not be worn underneath the suits because, as soon as a person perspires, the cotton is wet (A71) and USCG prohibits the use of cotton as an undergarment. (A71) Putting on a suit is a bit of a workout. (A71) You get sweaty just putting on a dry suit according to Jerry Langan. (A79) Jerry Langan, who was just sitting, was perspiring in the courtroom where the temperature was lower than

the air temperature for the tests.  (A79)  Jerry Langan testified that, when you are in a

closed system, you sweat.  (A80)  Kimberly Johns testified that, although people

perspire differently, everyone standing on a pool deck in 85 degrees in a closed

system (dry suit) wearing a cotton T-shirt would have some sort of perspiration, with

some being soaked.  (A90)  Kimberly Johns further testified that once you put water

on cotton it spreads fast.  (A92)  If you put one drop on his cotton shirt it will spread

out within a couple of minutes to form a spot of three or four inches.  (A92)

The video shows the Navy could not tell the difference between perspiration

and water.  (Appendix, item 20 video at 5:43-5:48)  The discussion of water versus

perspiration on the video would have occurred only if some of the Navy divers were

perspiring.  Kimberly Johns testified that, if one follows the USCG standards of

testing the suits at 50 degrees water and air temperature, the moisture from

perspiration would be minimal.  (A92)

### B.    The Navy Used A More Stringent Test Standard For Defining A Leak

The Maintenance Procedure defines leak and serious leak and indicates

minor seepage aground the seals is normal:  "Minor seepage aground the wrist and

neck seals is normal and does not indicate a leak.  Isolated water soaked spots on

the undergarment, or soaked socks, indicates a leak.  Flooding into the dry suit

socks indicates a serious leak."  (A130)  The Navy used a more stringent standard.

Randolph Lawson, who supervised the testing for the Navy, testified that, if a

Navy diver had "a little wet spot", the Navy would "call it a leak." (A65)  He also

testified that the Navy considered "a tiny wet spot along the zipper" a leak.  (A65)

He also testified that, if the Navy "detected any moisture, it was a leak."  (A65)

Randolph Lawson never mentioned that the undergarment had to have a water

soaked spot to be considered a leak as required by the Maintenance Procedure.

Further, it is not credible to say that "any moisture" was from a leak rather

than perspiration, especially considering the high temperatures at which the Navy

conducted its testing.  It is also not credible that "a tiny wet spot along the zipper"

was from a leak where the Navy did not wipe the suits down before unzipping them.

(Appendix, item 20, *passim*)  It is also not credible that "any moisture" could not

have come from normal seepage around the seals which the Maintenance Procedure

says does not indicate a leak.

The CBCA was confused because the decision incorrectly uses the words

"wet" and "damp" interchangeably.  (A8-9)

### C.    The Seals Ripped Because Of Navy Errors

The parties agreed that testing of the suits required compliance with the User

Manual.  (A193, 197-98)  USCG asserted that it complied with the User Manual.

(A49, 197-98)   The User Manual requires compliance with the Rescue and

Survival Systems Manual with respect to thermal undergarments.

The Navy reported three slight tears on the left wrist for the pre-cure suits and one large tear on the left wrist for the post-cure suits (A163-64), which U.S.I.A. had reinforced by bartacking them. (A201) But the video of the Navy testing shows the Navy divers wearing watches on their left wrists contrary to the requirement to remove watches as stated in the User Manual (A193) and the Rescue and Survival Systems Manual. (A105) This invalidates the testing relating to the tearing of the wrist seals.

The Navy reported one large neck tear and one slight neck tear on the pre-cure suits and no tears for the post-cure neck seals. (A201)

The Rescue and Survival Systems Manual (AF105-06) and User Manual (A193-94) require the use of fingers to stretch the wrist and neck seals while donning the suit. The video of the Navy testing does not show the divers donning the dry suits so the record does not show whether the Navy divers used their fingers to stretch the seals to avoid tearing; thus, the testing of the neck and wrist seals is invalid.

### D.    The Zippers Were Not Always Seated

The Rescue and Survival Systems Manual requires that "a fellow crewmember double check slide fastener to ensure it is closed completely against the sealing plug." (A106) The Navy did not comply with this requirement. During the tests, the Navy divers were advised to check the seating of the zippers

after one diver appeared to be wet from the zipper area.  (Appendix item 20, video at 8:52-9:04)  A diver walking down the ladder says "Oops, hold on" (Appendix item 20, video at 8:57) and walks back up the ladder.  Failure to seat the zipper would have allowed pool water to enter the suit and cause wetness of the undergarments from the waist down.

### E.    The Navy Improperly Counted Leakage From The Seals As A Failure

With regard to seepage around the neck and wrist, Randolph Lawson testified that he was **not** one hundred percent certain that there was no seepage from the neck and wrist (sleeve) seals.  (A55)  In fact, the Navy video indicates that the second post-cure suit leaked from the neck seal.  (Appendix, item 20 at 6:32 and 6:44)

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons cited above, USCG improperly terminated the Order for cause. U.S.I.A. requests that the Court determine that U.S.I.A. is entitled to either breach damages or a termination settlement by virtue of a conversion of the termination of cause to one for convenience pursuant to FAR 52.212-4(m).

Respectfully submitted,

/s/ Joseph G. Billings
Joseph G. Billings
Miles & Stockbridge P.C.
100 Light Street
Baltimore, MD 21202
jbillings@milesstockbridge.com
Direct Tel (410) 385-3497
Direct Fax (410) 773-9087
jbillings@milesstockbridge.com

*Counsel for Appellant*

# ADDENDUM



**UNITED STATES**
**CIVILIAN BOARD OF CONTRACT APPEALS**

DENIED: January 27, 2014

CBCA 2579

U.S.I.A. UNDERWATER EQUIPMENT SALES CORPORATION,

Appellant,

v.

DEPARTMENT OF HOMELAND SECURITY,

Respondent.

Joseph G. Billings of Miles & Stockbridge, P.C., Baltimore, MD, counsel for Appellant.

Wilbert Jones, Office of Procurement Law, United States Coast Guard, Department of Homeland Security, Washington, DC, counsel for Respondent.

Before Board Judges **SOMERS, DRUMMOND** and **SHERIDAN**.

**SOMERS**, Board Judge.

The United States Coast Guard (USCG, Coast Guard, or respondent) placed an order against the Federal Supply Schedule contract of U.S.I.A. Underwater Equipment Sales Corporation (U.S.I.A. or appellant) for 777 dry suits. According to the Coast Guard, the suits leaked during testing. The Coast Guard terminated the contract for cause. Appellant appealed the termination. The Coast Guard claims entitlement to reprocurement costs. After a hearing on the merits and after reviewing the records, as well as extensive prehearing and posthearing submissions, we find that the evidence supports the Coast Guard's decision to terminate the contract for cause and deny the appeal. However, because the Coast Guard failed to properly assert its claim for excess reprocurement costs, we do not possess jurisdiction to entertain that claim.

## Findings of Facts

On August 25, 2010, the contracting officer for the Coast Guard issued request for quotations (RFQ) no. HSCG23-10-Q-QW2859. The RFQ invited companies to submit a quote for 522 boat crew dry suits on a firm, fixed-price basis, in accordance with the company's GSA Schedule 84 contract. The single page of specifications attached to the RFQ identified three model numbers that would be acceptable for submission. This included U.S.I.A.'s Model CG/8880.

U.S.I.A. had two active contracts, the GSA Schedule 84 contract (GSA schedule contract) and a Coast Guard indefinite delivery indefinite quantity (IDIQ) contract (the IDIQ contract). U.S.I.A. submitted a price quote for dry suits, using the U.S.I.A. model number for its IDIQ contract, rather than the model listed on the GSA schedule contract. The Coast Guard contacted U.S.I.A. about the model numbers, and U.S.I.A. confirmed that the dry suit on the GSA schedule contract was the same as the one on the IDIQ contract. Although the GSA schedule contract quoted a price of $849 per dry suit, U.S.I.A. based its proposal using the IDIQ contract price of $599 per dry suit. The Coast Guard and U.S.I.A. agreed that U.S.I.A. would deliver these dry suits under the same terms and per unit prices provided for in its IDIQ contract.

On September 25, 2010, the Coast Guard placed an order against U.S.I.A.'s GSA schedule contract for 777 dry suits, valued at $465,423, to be delivered within seventy-five days. The size of the order exceeded the maximum order on the GSA schedule contract, which was $50,000. Nonetheless, U.S.I.A. accepted the order and started performance.

The order signed by the contracting officer contained different terms from those set forth in the RFQ. The order included an additional paragraph in section E, entitled "E2. Inspection and Acceptance Requirements." Paragraph E2 required, among other things, that the dry suits be submitted to an immersion test, in accordance with the Coast Guard's maintenance procedure, in order to check for leaks. The Coast Guard added this provision unilaterally.

U.S.I.A.'s GSA contract, under which the order was issued, includes Federal Acquisition Regulation (FAR) clause 52.212-4, Contract Terms and Conditions – Commercial Items, which provides:

> Inspection/Acceptance: The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance.

CBCA 2579                                                                                                          3

This clause does not identify specific testing procedures.

U.S.I.A. shipped one hundred suits to the USCG Training Center in Yorktown, Virginia, on November 10, 2010. Upon inspection, the Coast Guard determined that the neck and wrist seals of the suits did not comply with the specifications. Consequently, on November 19, 2010, the Coast Guard issued a cure notice notifying U.S.I.A. that the suits had failed inspection.

The parties discussed the problem and agreed that U.S.I.A. could use different material for the neck and wrist seals. On December 12, 2010, the parties executed a bilateral modification to the delivery order. The modification stated that "[t]he purpose of this modification is to change the delivery date, change the specification, and add a first article requirement."[1] The modification detailed the changes to the specifications, increased the price, and extended the delivery date to 150 days after award, February 22, 2011.

On December 29, 2010, U.S.I.A. shipped 120 dry suits with the newly configured neck and wrist seals to the Yorktown Training Center, where they were received by the Coast Guard on January 7, 2011. The Coast Guard tested three of the suits. It found that all three suits leaked at the relief zipper. On January 12, 2011, the contracting officer told U.S.I.A. not to send any more suits until the parties had a chance to discuss the matter.

The Coast Guard tested more of the modified dry suits on January 18 and 24, 2011. On January 18, the Coast Guard tested sixty-six of the 120 suits and determined that all of the suits leaked. On January 24, testing revealed that another thirty-nine of the 120 suits leaked. The Coast Guard videotaped both testing sessions.

Meanwhile, on January 19, 2011, U.S.I.A. sent one hundred more dry suits to USCG, together with an invoice for $59,900. The contracting officer contacted U.S.I.A. by e-mail on January 27, 2011, advising that the Coast Guard had received the second shipment of one hundred suits. Because so many of the first shipment of dry suits had failed testing, the contracting officer informed U.S.I.A. that the Government would not accept any more shipments until the issue could be resolved.

---

[1]        The modification did not provide any details about what was intended by the "first article requirement," and, in fact, testimony at the hearing confirms that neither the Coast Guard nor U.S.I.A. considered a "first article requirement" to have been added to the contract requirements.

That same day, U.S.I.A. questioned whether the tests had been properly conducted and requested a conference call to discuss the problem. The contracting officer promised that a conference call would be scheduled early the following week. Desiring to deal with the issue more immediately, U.S.I.A.'s Jerry Langan, U.S.I.A.'s Vice President of Underwater Equipment Sales, responded to the contracting officer as follows: "All I need is a couple of minutes with someone today. This is a critical issue for our company."

The contracting officer did not contact U.S.I.A. until February 1, 2011, when the contracting officer issued a second cure notice. Meanwhile, the Coast Guard ordered 149 dry suits from another contractor for delivery to the Yorktown Training Center. The Coast Guard did not tell U.S.I.A. about this purchase. In the February 1, 2011, cure notice, the contracting officer advised U.S.I.A. that the Government considered U.S.I.A.'s failure to supply acceptable dry suits to be a condition endangering performance of the delivery order. The contracting officer warned U.S.I.A. that it would terminate the order for cause under the terms and conditions of FAR 52.212-4(m)[2] unless the condition was cured within fifteen days after receipt of the notice. U.S.I.A. immediately contacted the contracting officer, stating that U.S.I.A. is "still waiting for a response on the conference call. We are extremely concerned with the problems and really would like to know what the issues are."

On February 2, 2011, the contracting officer responded that "[t]he results of the tests were attached to the cure notice. We can discuss this matter, but you're still obligated to cure this [within] the time frame of the notice." U.S.I.A. then told the Coast Guard that U.S.I.A. had "issued a call tag to have the suits picked up at the delivery site. We will examine the suits to see what exactly is the problem." When U.S.I.A. had not received the suits back, on

---

[2]     FAR clause 52.212-4(m) states:

The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms or conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated the contract for default, such termination shall be deemed a termination for convenience.

CBCA 2579                                                                                        5

February 11, 2011, U.S.I.A. stated that "[u]nfortunately we have yet to receive the suits back from Yorktown to test them. Which is an issue seeing as how we are required to send back the cure notice within the 15 days." U.S.I.A. finally received the suits on February 14, 2011.

U.S.I.A. reinforced the suits in a further attempt to eliminate any leakage problems. It proposed sending five more suits to the Coast Guard for additional testing before sending the bulk of the order, and requested to "have a U.S.I.A. representative come out to Yorktown and assist and observe the testing of these suits after they have been received by the US Coast Guard. We feel this is extremely important to make sure that everyone is comfortable and confident in our suits." It also offered to pay for the Coast Guard's technical representative to come to its manufacturing facilities to observe U.S.I.A.'s manufacturing and testing procedures. On February 16, 2011, the contracting officer responded to U.S.I.A. by advising that the Coast Guard's goal at that point was to arrange for an independent party to test a sample of both sets of suits – meaning the modified suits from the January 19, 2011, shipment and the suits that were reinforced following the February 1, 2011, cure notice.

Over the course of the next few months, U.S.I.A. repeatedly requested that the Government return the one hundred suits that had been sent to the Coast Guard on January 19, 2011. During one e-mail exchange on March 31, 2011, U.S.I.A. stated that it had 700 "nearly completed" suits on its production floor, had spent "a tremendous amount of money" on the order, was experiencing "severe financial strain," and was concerned that the Coast Guard had neither returned the one hundred suits for evaluation nor paid the $59,900 invoice for those suits. U.S.I.A. complained that it had not heard from the Coast Guard in nearly two months. According to U.S.I.A., the Coast Guard did not respond to its inquiries. During this time, on April 20, 2011, the Coast Guard ordered 333 dry suits from another manufacturer for delivery to Yorktown Training Center, again without U.S.I.A.'s knowledge.

On May 26, 2011, the Coast Guard notified U.S.I.A. that it had made arrangements for the Navy to test the suits. The Coast Guard requested that U.S.I.A. send twenty-five dry suits to the Navy for testing. The parties sent e-mail messages back and forth. Ultimately, U.S.I.A. agreed to send suits to the Navy facility.

Kimberly Allen Johns, President of U.S.I.A., testified that, prior to delivering the twenty-five reinforced dry suits to the Navy, U.S.I.A. conducted an immersion leak test on each. Following inspection, U.S.I.A. determined that none of the dry suits leaked. U.S.I.A. did not videotape this testing.

On July 5, 2011, the Navy received the twenty-five reinforced dry suits from U.S.I.A. Later that month, on July 25, 2011, the Navy tested a total of twenty U.S.I.A. suits: ten suits

from the one hundred shipped to the Coast Guard on January 19, 2011, and ten of the twenty-five reinforced suits sent directly to the Navy.

The Navy sought to model its testing procedures on those employed by the Coast Guard. To that end, the Coast Guard provided the Navy with the testing procedures set forth in paragraph E2 of the delivery order. The Coast Guard also provided the Navy with the results from its January 18 and January 24 tests.

During the July 25, 2011, testing performed by the Navy, the water temperature of the testing pool was 80 degrees Fahrenheit, and the ambient air temperature was 78-80 degrees Fahrenheit. The Navy test participants wore thermal undergarments consisting of 65% cotton and 35% polyester. According to the August 8, 2011, report of the testing results, the Navy reported that nineteen out of the twenty suits leaked from the waist down. The report also stated that 100% of the suits experienced some other level of leakage.

The Navy videotaped the majority of the testing performed on July 25, 2011. The videotapes of this testing (as well as the other videotapes) were presented during the course of the hearing.[3] The video documentation of the testing is neither complete nor edited in a way that makes clear exactly which suit (meaning pre-cure or post-cure) is being tested. Despite this, the video documentation of the Navy testing reveals that some of the undergarments appear to be wet, at least to some extent.

The Coast Guard issued a show cause notice to U.S.I.A., dated September 1, 2011, and provided U.S.I.A. with a copy of the Navy's report containing the testing results. The notice gave U.S.I.A. ten days to show cause as to why its contract should not be terminated.

On September 7, 2011, U.S.I.A. responded, pointing out that the value of the order exceeded the maximum order limitation under U.S.I.A.'s GSA schedule contract, and indicated that U.S.I.A. had decided to decline the task order. U.S.I.A. noted that the Coast Guard had failed to pay for any of the one hundred suits delivered on January 27, 2011. In a separate letter, U.S.I.A. said that it no longer wished to work with the Coast Guard on the order, stating:

> The inability of the United States Coast Guard to cooperate and communicate with U.S.I.A. in opening a meaningful dialog, not returning phone calls, not answering e-mails, not involving us in the process in a timely manner has led

---

[3]      The videotapes are in evidence and have been reviewed completely in the course of the Board's review of the record.

CBCA 2579                                                                    7

us to this point. [U.S.I.A.'s representative is] happy to discuss this matter with
any authorized Coast Guard representative at any time.

By letter dated September 16, 2011, the Coast Guard terminated the order for cause
in accordance with FAR clause 52.212-4(m). The termination letter stated:

Consistently between November 2010 and July 2011, U.S.I.A. supplied faulty
products that did not meet the requirement set forth in the task order. As
detailed in the testing results . . . the suits repeatedly failed testing and
inspection procedures with such problems as leakage from the seams and
tearing of the seals. These products are not compliant with the task order and
suitable for use by USCG personnel.

The termination letter states that the Coast Guard "intends to seek damages in the amount of
reprocurement costs." The Coast Guard returned eighty-eight of the one hundred suits to
U.S.I.A. on September 19, 2011. The Coast Guard did not pay for any of the suits.

According to the Coast Guard, it purchased 423 dry suits as replacement suits from
another manufacturer at a cost of $380,172.10 to cover suits under the U.S.I.A. order before
it terminated the contract. It later purchased 660 suits from a third manufacturer, 354
allegedly purchased as replacement suits at a cost of $247,584. In sum, the Coast Guard
alleges it purchased 777 suits at a total cost of $627,756.10 to replace the suits originally
ordered from U.S.I.A.

In its prayer for relief, the Coast Guard requested payment of reprocurement costs of
no less than $627,756.10. The Coast Guard has amended the request for repayment of
reprocurement costs in its post-hearing brief, and now seeks excess reprocurement costs in
the amount of $100,663.40.

At the hearing, both parties presented witness testimony. Among the witnesses was
Randolph Lawson, a special projects officer with the Navy Experimental Diving Unit.
Mr. Lawson led the testing of the dry suits conducted at the Navy facility. This witness
described the testing process. The subjects wore regular cotton long johns. Each test subject
examined the suit to ensure that the wrist and neck dams were intact. The subject waxed the
zipper and sprinkled talcum powder in the wrist, hands, and neck dam. The subject then
donned the suit and went into the water in the pool, keeping his or her hands and neck out
of the water. After fifteen minutes, the subject exited the water.

Mr. Lawson testified that he videotaped the subjects as they doffed the suits.
Mr. Lawson and his team determined that 100% of the suits had some form of leakage.

Mr. Lawson acknowledged that he did not remember whether he was aware at the time which of the suits were post-cure and which were pre-cure. Both parties used Mr. Lawson's videotape of the testing and asked him questions about the testing as the tape played in the courtroom. Some of the wet spots described by Mr. Lawson could be discerned visually from the videotape. Others could not. Nor could one easily discern simply from looking at or listening to the videotape whether the damp spots were from the pool or from sweat from the individual. Mr. Lawson did testify, however, that the wet spots that he observed were more consistent with leaks than sweat.

As noted previously, Mr. Johns testified about the testing procedure used by U.S.I.A. Mr. Johns explained the importance of wearing proper undergarments and of conducting the testing at lower temperatures. Mr. Johns testified that none of the dry suits leaked during his testing. Mr. Johns stated that the videotaped testing revealed that the Navy had used improper testing procedures by failing to properly dust talcum power on the seals, wearing cotton undergarments, and wearing wristwatches while donning the suits.

After the hearing, the parties filed post-hearing briefs and reply briefs.

Discussion

Termination for Cause

The question presented in this appeal is whether the Coast Guard properly terminated U.S.I.A.'s contract for cause. A termination for cause (similar to a termination for default but for commercial items) is "a drastic sanction which should be imposed (or sustained) only for good grounds and on solid evidence." *C-Shore International, Inc. v. Department of Agriculture*, CBCA 1697, 10-1 BCA ¶ 34,380, at 169,745 (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting *J.D. Hedin Construction Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969))). Such a termination is a government claim and the Government bears the burden of proof that its action was justified. *Lisbon*, 828 F.2d at 764-65. If the Government presents a prima facie case that the termination was proper, the burden shifts to the contractor to rebut the prima facie case. *CDA, Inc. v. Social Security Administration*, CBCA 1558, 12-1 BCA ¶ 34,990, at 171,971; *Integrated Systems Group, Inc. v. Social Security Administration*, GSBCA 14054-SSA, 98-2 BCA ¶ 29,848, at 147,742.

The Coast Guard has met its burden to show that the termination was proper. U.S.I.A. failed, on multiple occasions, to provide dry suits that met the specifications. The Coast Guard was more than justified in terminating U.S.I.A.'s contract for cause in light of the company's failure to provide adequate dry suits. These dry suits failed to meet specifications

despite U.S.I.A.'s attempts to modify the suits after the issuance of two cure notices. The Coast Guard confirmed this failure by conducting multiple tests.

U.S.I.A. argues that it did not agree to the Coast Guard's testing procedures, and that the Coast Guard failed to perform the tests properly. The GSA contract under which the delivery order was issued permits the Government to test the items purchased. FAR clause 52.212-4 provides that the "Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance." It does not mandate any particular type of testing procedure. After a review of all of the evidence presented, including videotaped evidence showing the damp spots, we conclude that the Coast Guard used an appropriate methodology for testing the dry suits. While U.S.I.A. may have used a different process for testing the suits and may have reached different results, U.S.I.A. failed to present persuasive evidence that the Coast Guard's testing was improper.[4]

Reprocurement Costs

Since the Coast Guard properly terminated U.S.I.A.'s contract for cause, it is entitled to receive its costs to reprocure the dry suits that U.S.I.A. had agreed to provide. FAR clause 12.403(c)(2) instructs the Government to acquire similar items from another contractor and to charge the defaulted contractor for any excess reprocurement costs.

In order to recover reprocurement costs, the Government must prove that: (1) the reprocured supplies or services are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize excess costs. *Cascade Pacific International v. United States*, 773 F.2d 287, 293-94 (Fed. Cir. 1985). In addition, in order to obtain these costs, the contracting officer must fulfill certain requirements set forth in the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109 (Supp. IV 2011). Specifically, "each claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer." *Id.* § 7103(a)-(3).

---

[4]     U.S.I.A. presented numerous arguments in support of its claim, including the following: The Coast Guard did not properly amend the order to specify the testing procedure set forth in paragraph E2 of the order; the Coast Guard did not prove that the suits leaked; and the Coast Guard breached the order, excusing U.S.I.A.'s performance. All arguments set forth in U.S.I.A.'s briefs have been considered.

Here, the Coast Guard has alleged that it procured similar dry suits to replace the ones that it had intended to procure from U.S.I.A.[5] The Coast Guard contends that it procured 149 replacement dry suits at the same time that it issued the February 1, 2011, cure notice to U.S.I.A. It apparently procured 333 more dry suits on April 20, 2011. The Coast Guard placed both of these orders before the July 25, 2011, testing conducted by the Navy of the dry suits that U.S.I.A. had reinforced pursuant to the February cure notice. Based upon the timing of these purchases, it is not reasonable to conclude that these items were purchased by the Coast Guard to replace those items purchased from U.S.I.A. U.S.I.A. still had the opportunity to cure any defects at this point. The Coast Guard had agreed to test the dry suits to see whether they met the specifications. Because of this agreement, until the Coast Guard completed such testing, the Coast Guard had no reason to terminate the contract for cause.

The Coast Guard purchased dry suits from a third manufacturer on September 26, 2011. This purchase occurred after September 16, 2011, when the Coast Guard issued the notice of termination for cause. While it is quite possible that the Coast Guard could establish that these items were procured to replace the items initially purchased from U.S.I.A., the Coast Guard's claim for reprocurement costs is premature.

As noted above, the CDA requires each claim to be the subject of a written decision by the contracting officer. 41 U.S.C. § 7103(a)(3). The Court of Appeals for the Federal Circuit has held that "a final decision by the contracting officer on a claim . . . is a 'jurisdictional prerequisite' to further legal action thereon." *Sharman Co. v. United States*, 2 F.3d 1564, 1568 (Fed. Cir. 1993), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995); *see also England v. Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004). Here, the contracting officer has not issued a final decision assessing excess reprocurement costs in a sum certain against the contractor. All that has occurred is

---

[5]    Respondent apparently attempted to supplement the appeal file with the invoices for the procurement of the dry suits by the submission of a motion on December 9, 2011. Exhibits appended to the motion included invoices for the procurement of the dry suits. However, because respondent submitted these documents through the Board's electronic filing system in a file format not permitted under the Board's Rules, the filing was rejected. See 48 CFR 6101.1(b)(5)(iii) (2011). Apparently the parties never realized that the documents had not been filed properly, despite the fact that the Board never took action on the motion. The existence of these exhibits only came to the Board's attention because the parties referenced these exhibits in the joint pretrial statement submitted on April 26, 2013. In fact, respondent did not reference the exhibits in its post-hearing brief. For the purpose of this analysis, the Board will take note of the existence of the invoices, despite the fact that the actual invoices have not been properly filed with the Board.

CBCA 2579                                                                11

that the Government mentioned the possibility of a future assessment of reprocurement costs of an undetermined amount. Until the Government issues a final decision assessing excess reprocurement costs, and U.S.I.A. appeals the final decision, we do not possess jurisdiction to entertain the Government's prospective claim. *Diamante Contractors, Inc. v. Department of the Interior*, CBCA 2017, 11-1 BCA ¶ 34,679, at 170,821 (citing *Job Line Construction, Inc.*, EBCA C-9408177, 95-1 BCA ¶ 27,429, at 136,693 (1994)); *see also Introl Corp.*, ASBCA 27610, 84-1 BCA ¶ 17,000.

Decision

The appeal is **DENIED**. The Government's demand for excess reprocurement damages is dismissed for lack of jurisdiction.


JERI KAYLENE SOMERS
Board Judge

We concur:


JEROME M. DRUMMOND                    PATRICIA J. SHERIDAN
Board Judge                           Board Judge

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

*U.S.I.A. Underwater Equipment v. DHS,* No. 2014-1498

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by MILES & STOCKBRIDGE, PC, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **August 29, 2014,** counsel has authorized me to electronically file the foregoing (corrected) **Brief for the Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

> Domenique Grace Kirchner, Esq., Senior Trial Attorney
> Department of Justice
> Commercial Litigation Branch, Civil Division
> PO Box 480
> Ben Franklin Station
> Washington, DC 20044
> Domenique.Kirchner@usdoj.gov
> c-natcourts.appeals@usdoj.gov

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.  The brief was originally filed and served on August 22, 2014

August 29, 2014

/s/ Robyn Cocho
Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS**

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  X   The brief contains  13,990 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

_____ The brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  X   The brief has been prepared in a proportionally spaced typeface using MS Word 2013  in a 14 point Times New Roman font or

_____ The brief has been prepared in a monospaced typeface using _____ _____in a ___ characters per inch_____ font.

August 22, 2014                            /s/ Joseph G. Billings_____
                                               Joseph G. Billings
                                               *Counsel for Appellant*